# EXHIBIT A

# Complaint and Summons

# EXHIBIT A

Electronically Filed
1/18/2018 12:14 PM
Steven D. Grierson
CLERK OF THE COURT

1  DAVID LIEBRADER, ESQ.
   STATE BAR NO. NV 5048
2  THE LAW OFFICES OF DAVID LIEBRADER
   601 S. RANCHO DR. STE. D-29
3  LAS VEGAS, NV 89106
   PH: (702) 380-3131
4  Attorney for Plaintiff

5

                    DISTRICT COURT
6                CLARK COUNTY, NEVADA

7
                                          A-18-767962-C
8  IN THE MATTER BETWEEN              )   Case No.
                                      )        Department 29
9  KEN LANDOW, KEN LANDOW IRA, KEN    )   Dept.:
   LANDOW ASSOCIATES LIMITED          )
10 PARTNERSHIP,                       )
                                      )   EXEMPT FROM ARBITRATION:
11           PLAINTIFF,               )   EXCEEDS JURISDICTIONAL
        v.                            )   MINIMUM
12                                    )
   ALVERY A. BARTLETT, JR. AND BERTHEL)
13 FISHER & COMPANY FINANCIAL SERVICES)
   INC.,                              )   JURY TRIAL DEMANDED
14                                    )
           DEFENDANTS.                )
15                                    )
   _____)
16

17     Plaintiff states his claim against the Defendants, jointly and severally, as follows:

18                           INTRODUCTION

19     1.    Dr. Ken Landow ("Plaintiff" or "Dr. Landow") is a 69 year old man who lives in

20     Las Vegas, Nevada.  Dr. Landow brings this claim individually, on behalf of his

21     individual retirement account, and on behalf of his former medical practice: the Ken

22     Landow Associates Limited Partnership.

23     2.    Defendant Alvery A. Bartlett Jr. ("Mr. Bartlett") was employed as a registered

24     representative with Berthel Fisher & Company Financial Services, Inc. at the time of

25     the transactions at issue in this claim.

26

3.   Defendant, Berthel Fisher & Company Financial Services, Inc. ("BFC") is a FINRA licensed broker dealer doing business in the State of Nevada.

<u>FACTUAL BACKGROUND GIVING RISE TO THIS CLAIM</u>

4.   This is an action for the recovery of investment losses.  There are twenty five investments at issue; all are high risk, illiquid direct participation program ("DPP") private placement securities sold by Defendants to Plaintiff.  Most are oil and gas offerings.  According to Mr. Bartlett, these investments were to provide income to Plaintiff for his retirement.  Instead, these investments have largely become worthless, and Plaintiff has been deprived of  substantial source of principal and income to provide for his retirement needs.

5.   Plaintiff is a retired medical doctor living in Las Vegas, Nevada.  The investments at issue represent a series of transactions that Plaintiff made with Bartlett over the past 15 years that were to provide a source of principal and income for Plaintiff's needs in retirement.  Defendant Bartlett sold these same high risk, illiquid investments to Plaintiff since the early 2000s, and the losses suffered have substantially depleted the funds that Plaintiff had set aside for his retirement.

6.   Plaintiff was introduced to Defendant Bartlett in 2003 as a result of a referral from Plaintiff's close friend former Las Vegas attorney Neil Galatz, another client of Mr. Bartlett's.  Plaintiff had just received an inheritance, and was looking for advice on how to invest it.  Mr. Galatz suggested he contact Mr. Bartlett, and from that point until earlier last year Plaintiff was a client of Mr. Bartlett's, and until this year, of Berthel Fisher.

7.   Initially, Mr. Bartlett would call Plaintiff weekly, and in between Dr. Landow's busy

appointment schedule with patients, Plaintiff would take Mr. Bartlett's calls. During these calls Mr. Bartlett would discuss retirement planning, income strategies, taxes and broader market topics. Mr. Bartlett was also adept at name dropping, frequently citing his relationships and the discussions he had with the CEOs of the investment companies whose securities he was selling. To a busy doctor in a patient centric practice, these discussions were interesting, and Bartlett soon became a trusted advisor to Dr. Landow.

8.    At the time Dr. Landow was running a busy dermatology practice in Las Vegas. For over 30 years his caring approach endeared him to several generations of Las Vegans, and he was asked to become the personal family physician for several of Las Vegas' influential families. His busy practice and obligations as a personal physician took up much of his free time, which lead to an increasing reliance on advice from Alvery Bartlett.

9.    Throughout his career Dr. Landow regularly put aside funds for retirement, and it was these funds that Mr. Bartlett targeted for his private placement investment strategy.

10.    From the beginning of the relationship in the early 2000s Dr. Landow told Mr. Bartlett that he wasn't looking for outsized returns. He told Mr. Bartlett that he was "married to his practice," and was looking to the money generated from the savings from his practice to provide a comfortable living for him in retirement.

11.    Dr. Landow's risk tolerance was always "moderate" He didn't want to take excessive risk, and told Mr. Bartlett so. He also never told Mr. Bartlett that he wanted to speculate with the funds he was investing. Mr. Bartlett acknowledged these objectives and agreed to abide by Plaintiff's wishes.

3

12.  Mr. Bartlett described his investment approach as identifying and investing in stable, income producing investments in companies with strong balance sheets and dynamic, industry recognized CEOs.  For every investment recommended Mr. Bartlett told Dr. Landow that he and BFC had carefully evaluated the sponsor and the transaction deal points, and found the investment terms extremely favorable, and appropriate for Plaintiff's income and retirement needs.

13. These statements were materially misleading, as neither Bartlett nor BFC fulfilled their FINRA obligations to conduct an independent professional level of due diligence into the programs.  For both Bartlett and BFC, these programs were a way to increase fees and commissions by selling high commission, high fee products to Dr. Landow.  In addition, rather than recommending investments consistent with moderate risk, Mr. Bartlett recommended exclusively high risk investments.

14.  Rather than disclose these facts, Mr. Bartlett stressed to Dr. Landow that the transactions represented an opportunity to invest with some of the best operators in the oil and gas, real estate and technology industries, and that all of the sponsors had proven track records of success.   What Mr. Bartlett failed to tell Plaintiff was that in addition to the high fees and high commissions, these were risky, illiquid investments that Plaintiff would be unable to liquidate once Bartlett's promised returns failed to materialize.

15.  A brief description of the key points raised during the sales presentations are as follows:

**MISSION GAS ROCKY MOUNTAIN**
Mr. Bartlett told Dr. Landow this was an exceptional investment with no risk.  Mr. Bartlett brought several of the principals of the company to Las Vegas to meet with Dr. Landow and Neil and Elaine Galatz.  At the meeting Mr. Bartlett and the men

4

proposed they get a letter of credit for $1MM dollars with the backing of stock and other assets. They even provided a bank willing to do the loan transaction. According to Mr. Bartlett, the three investors would pay an origination fee but the interest would be paid by sale of the gas. The letter of credit was to be paid off by the company within several years. This was not an income project but was supposed to return somewhere between 10-20x of Dr. Landow's original investment when the project sold within up to 8 years. The company paid off the letter of credit and Mr. Bartlett promised 3-8x return which never materialized

**Amount invested: $1,000,000 )per line of credit)**
**Date: January 10, 2005**
**Status: loan repaid to bank, no return to Plaintiff**

**NYTROX EQUITY AND LOANS**
Mr. Bartlett was extremely excited about this company. It produced ozone capable of killing bacteria and mold from cooling towers, water systems, lakes on golf courses and both cars and buildings after water damage. He told Dr. Landow that there was no limit to the upside potential of this supposedly revolutionary company. According to Mr. Bartlett several large corporations such as Honeywell as well as the farming industry were interested in the product. Mr. Bartlett claimed he devoted significant time and energy to this company and saw the technology as a major game changer.

**Amount invested: $860,000**
**Date: August 11, 2003**
**Status: current value $0**

**ABFM (The Alvery Bartlett Hedge Fund)**
Mr. Bartlett promised this investment in the Alvery Bartlett Hedge Fund would be associated with the top people in the world of finance. He mentioned high profile names from Goldman Sachs, Knight Trading and an executive of the NYSE along with a series of investors who would provide name recognition and be able to bring in large sums of money for him to invest. He said he would not take any money out of the fund until all of the investors had received their money back. He also said he would purchase insurance for $1MM so that if he became infirm the investors would be safe. He said the investment would take about 3 or more years to mature. In a meeting in Las Vegas in January 2017, Mr. Bartlett confessed that he used the funds Dr. Landow invested as a sort of piggy bank for his usual and customary office expenses for his Berthel employees – because otherwise he couldn't afford to pay them. He said he would repay ABFM for the money he used for non ABFM purposes

**Amount invested: $400,000**
**Date: May 12, 2004**
**Status: current value$0**

**BEHRINGER HARVARD STRATEGIC OPPORTUNITY FUND**
Mr. Bartlett said he was intimately familiar with Behringer Harvard, and represented that they had done 15 deals since 1993 each with a 3-5 year time to sale with an average 45% ROI. He said the partnership would yield 7% and was a value added

deal.   It was to be a safe, well-funded REIT with downtown office space and provide liquidity within 5 years.
**Amount invested: $100,000**
**Date: September 23, 2005**
**Status: current value$0**

**TWO HORSE**
This was an investment project that Mr. Bartlett , his brother-in-law attorney Scott Faley, Neil Galatz and Dr. Landow participated in.  Mr. Bartlett was the manager and directed the placement of funds for investment.  The first project was Pickle, a company started by two friends of Mr. Bartlett's son.  Mr. Bartlett claimed to have mentored them, and said they were very successful in business.  Dr. Landow invested in their media and picture storage business, and later  invested in a company dealing with animation technology with Randy Smith on the board – the same operator of the Insite projects.  Another investment was in a company started by another friend of Mr. Bartlett , Tony Thompson, who was the operator of a large REIT corporation-Thompson Properties and Triple Net.
**Amount invested: $101,000**
**Date: August 25, 2006**
**Status: current value$0**

**PDC 2006-P**
Mr. Bartlett was especially fond of this oil and gas producer, particularly the 2006-P series. He claimed this investment would provide tax advantaged income and was a good long term investment.  Mr. Bartlett said he worked closely with management was especially pleased with the idea the company provided significant insurance so that investors could be general partners for the first year and then transfer to become limited partners afterward.
**Amount invested: $600,000**
**Date: August 31, 2006**
**Status: current value$0**

**INSITE I-4**
Insite was an outdoor advertising company was supposed to provide significant upside potential within a 3-5 year period with an increase in value of anywhere between 2-4x the original investment. It was to be like a REIT and provide income.  Mr. Bartlett said the company offered the strongest balance sheet in the billboard industry.  He claimed special knowledge of the company since its president was a good friend of Mr. Bartlett's,  and they had been involved in other business ventures together.  Ultimately as an additional source of income and value, Insite was to rent space on the platforms to cell phone companies to be used to boost their signals.
**Amount invested:$25,041**
**Date: November 17, 2006**
**Status: current value $0**

**KBS REIT I**

Mr. Bartlett was extremely excited about REITs and their ability to both provide a very stable, reliable source of income while at the same time growing in inherent value. He said he liked KBS I the most and thought it should be a base investment for Dr. Landow's portfolio. He thought the yield would be between 7-9% and that after 5-8 years the property would sell for much more than he invested in it.

**Amount invested:$502,800**

**Date: November 29, 2006 and January 25, 2007**

**Status: current value$0**

**KBS REIT II**

Mr. Bartlett was even more excited about this REIT. He told Dr. Landow that it had even greater potential that the first offering, and was already profitable since it was able to buy prestigious properties in New York and Washington at deeply discounted prices. He mentioned that they enjoyed a unique financing opportunity. As with KBS I this REIT would provide a stable source of income and sell at a considerable profit within a time range of 5-8 years.

**Amount invested: $330,000**

**Date: September, 2009**

**Status: current value:$120,000**

**APARTMENT TRUST OF AMERICA**

Mr. Bartlett stated this REIT would provide a 6.5% annual income along with a solid investment in a stable and growing apartment market. He also told Dr. Landow that a "liquidity event" could occur with significant upside potential.

**Amount invested: $200,000**

**Date: January 2, 2007**

**Status: current value$0**

**INSITE I-5**

Insite was an outdoor advertising company was supposed to provide significant upside potential within a 3-5 year period with an increase in value of anywhere between 2-4x the original investment. It was to be like a REIT and provide income. Mr. Bartlett said the company offered the strongest balance sheet in the billboard industry. HE claimed special knowledge of the company since its president was a good friend of Mr. Bartlett's, and they had been involved in other business ventures together. Ultimately as an additional source of income and value, Insite was to rent space on the platforms to cell phone companies to be used to boost their signals.

**Amount invested: $175,000**

**Date: January 9, 2008**

**Status: current value$0**

**ATLAS #17-2008**

Mr. Bartlett was a firm believer in the various Atlas funds and its principals, the

Cohen family of Philadelphia.  The project was to provide significant tax advantages coupled with long term income and stability.

**Amount invested:$700,000**
**Date: April 29, 2008**
**Status: Loss: $491,750**

**FORMOSA**
This was the name of an independent film produced by Will Tao that Mr. Bartlett somehow befriended.  Mr. Bartlett thought the film would do well with PPV, TV, DVD, airplane and other merchandising.  He was so impressed with the film and its prospects he advised Dr. Landow to invest in it through Two Horse partners.  Mr. Bartlett also thought Dr. Landow should put additional money into Formosa after the film debuted in Los Angeles.

**Amount invested: $100,000**
**Date: January 13, 2009**
**Status: current value$0**

**ATLAS #18-2008**
Mr. Bartlett was a firm believer in the various Atlas funds and its principals, the Cohen family of Philadelphia.  The project was to provide significant tax advantages coupled with long term income and stability.

**Amount invested: $250,000**
**Date: January 15, 2009**
**Status: loss $175,625**

**ATLAS #18-2009**
This was another Atlas project.  Mr. Bartlett was a firm believer in the various Atlas funds and its principals, the Cohen family of Philadelphia.  The project was to provide significant tax advantages coupled with long term income and stability.

**Amount invested: $700,000**
**Date: June 30, 2009**
**Status: loss $491,750**

**RESOURCE REAL ESTATE INVESTORS 7 LP**
Mr. Bartlett stated that this investment would provide an 8% dividend with some of it tax advantaged.  This was a company that purchased grade B rental property in grade A neighborhoods.  After minimal renovation the rental value would be enhanced.  According to Mr. Bartlett further adding to the safety of the company, it "cherry picked" the properties which were then purchased at a "steal".

**Amount invested: $100,000**
**Date: August 31, 2009**
**Status: loss $75,702**

**NOBLE ACCESS FUND V**
Mr. Bartlett believed that this investment would "balance" Dr. Landow's portfolio with more oil and gas instead of real estate.  Mr. Bartlett believed this was the best

project in the industry, and told Dr. Landow that oil and gas was poised for a large advance. Mr. Bartlett had a long track record with this company, said he knew it well and was certain of its future. He would always speak glowingly of how Noble had the inside track on any royalty property that became available and how his was basically the only major independent firm in the business.

**Amount invested: $200,000**
**Date: January 22, 2010**
**Status: current value:$0**

**NOBEL ACCESS FUND VII**

This was a company related to others Mr. Bartlett previously sold to Dr. Landow. Mr. Bartlett said it would provide strong earnings and an 8% rate of return. He said there was the possibility of a 1 year "liquidity event" in which case Dr. Landow would get my money back with the additional profits from the sale.

**Amount invested: $200,000**
**Date: June 10, 2010**
**Status: current value$0**

**ATLAS SERIES 28-2010**

According to Mr. Bartlett this was the best looking commodity company in the gas world. Mr. Bartlett was on close terms with the Cohen family from Philadelphia who were behind Atlas and had a long working relation with them. He thought the investment would provide tax advantages, significant earnings and long term stability.

**Amount invested: $700,000**
**Date: June 15, 2010**
**Status: loss $491,750**

**NOBLE ACCESS FUND VII**

This investment was to provide a 7-9% yield with a good possibility of a "liquidity event" within the first year. Mr. Bartlett stated that this investment was better than previous Noble offerings. Even without a sale, the project was expected to continue providing revenue over a 40 year period. Mr. Bartlett claimed extensive experience with this company, and convinced Dr. Landow of the safety and soundness of the investment.

**Amount invested: $85,000**
**Date: June 26, 2010**
**Status: current value$0**

**NGAS PARTNERS 2010-A**

Mr. Bartlett said that NGas was a big opportunity, and said the first batch of wells was better than anticipated. He told Dr. Landow to expect a "bonus" from the investment.

**Amount invested:$100,000**
**Date: December 29, 2010**
**Status: Loss $65,000**

9

**STRATEGIC ENERGY INCOME FUND I**
Mr. Bartlett told Dr. Landow this investment would provide a safe income stream with tax advantaged earnings.  It was not a buy and sell property but a long lasting fund that would continue to offer its benefits over many years.
**Amount invested: $500,000**
**Date: March 17, 2011**
**Current value:$100,000**

**INLAND NATIONAL RETAIL DST**
Mr. Bartlett said this was a "special investment" that was supposed to be advantageous by offsetting some previous investment tax losses that would have been otherwise wasted.  It was supposed to be capable of a 1031 exchange and provide both stable income and growth.
**Amount invested: $250,000**
**Date: April 1, 2011**
**Current value:75,000**

**NOBLE ACCESS FUND X**
Mr. Bartlett stated this investment would provide long term income and safety with a 7-12% dividend.  He believed that an eventual sale would provide a 3-4x return on the original investment.  He had both ongoing and significant previous experience with this company and had Dr. Landow invest in several of the funds.
**Amount invested: $500,000**
**Date: July 12, 2011**
**Status: current value$0**

**ATLAS SERIES 30-2011**
This was an investment Mr. Bartlett originally thought would not materialize.  He originally wanted Dr. Landow to invest $700,000 in the project, but it was oversold.  At Berthel's urging the company accepted my $400,000.  Mr. Bartlett thought this project was better than the previous Atlas projects and said that 98% of the wells were good.  Mr. Bartlett had extensive experience with the company, knew the principals quite well.  He had significant interaction with the Cohen family of Philadelphia who were stalwarts of the industry.
**Amount invested: $400,000**
**Date: November 29, 2011**
**Status: Loss $281,000**

**Total Amount invested: $9,078,841**
**Total loss: $6,637,918**

16. Based on Mr. Bartlett's representations that he and BFC had done an extensive due

    diligence investigation into all of these investments, and found them safe, income

producing investments with experienced management Plaintiff agreed to purchase

interests in amounts largely determined by Mr. Bartlett.

17. In fact these were not safe investments, and the representations that they were, and that

they were properly vetted by BFC and Bartlett was materially misleading.

18.   Mr. Bartlett knew that Dr. Landow was relying on these investments to provide

income for his retirement, and knew that the funds invested represented the proceeds

of a lifetime of saving.  Plaintiff repeatedly told Mr. Bartlett that he didn't want to take

risks with his funds, and only wanted him to recommend stable, conservative

investments.  Mr. Bartlett agreed to do so.

19.  The investments which are the subject of this claim are private placement securities

that Mr. Bartlett purchased for Plaintiff since the early 2000s.  Virtually all of the

excess cash generated by Dr. Landow's medical practice was handed over to Mr.

Bartlett and BFC, and used by them to purchase these high commission private

placements.  The investments described on pages 4-10 are all investments made more

than six years ago.[1]  Mr. Bartlett used excel spreadsheets to misrepresent the values of

these illiquid investments, by using the purchase price as the "approximate value."

These values were arbitrary, not based upon reliable estimations, and gave Plaintiff a

false sense of security as to the value of his portfolio.

20. In fact, Mr. Bartlett regularly used these spreadsheets to mislead Plaintiff into

believing that he would be able to redeem the investments for the amounts Mr. Bartlett

put on the spreadsheets.  Mr. Bartlett had no basis for using these values, as there is no

public market for these investments.  As a result of using these fictitious valuations,

---

[1] Disputes concerning investments made within the past six years are subject to FINRA

Mr. Bartlett mislead Plaintiff, breached his fiduciary duty and caused a delay in

Plaintiff discovering his actual losses

21.     As a result of the over concentration into high risk, high commission private

placements, coupled with Defendants' failure to perform competent due diligence, Dr.

Landow suffered massive losses in his retirement portfolio.   As a result of these

inappropriate investments Plaintiff has lost $6,637,918, as the investments are illiquid, and

Plaintiff is unable to redeem his interests.

22.   Plaintiff alleges on information and belief that each of the Defendants were at all

times the agents of each of the other Defendants, and each of them was authorized to

act as the principal or the agent of each other, and that the conduct referenced above

was done by each of the Defendants in the course and scope of said agency and in the

capacity of, and as principal or agent for each of the other Defendants.

LEGAL BASIS UPON WHICH RELIEF SHOULD BE GRANTED

BFC'S RESPONSIBILITY TO SUPERVISE BARTLETT

Control Person Liability, Respondeat Superior, Agency, State Law Control Person

23.     At all times described herein, Bartlett was a duly licensed agent of BFC

engaged in the purchase and sale of securities to the public.  As its agent, BFC had a

duty to monitor and supervise the activities of Bartlett in his solicitations of securities.

24.  As alleged herein, BFC failed to diligently supervise Bartlett.  FINRA Rules of

Practice Section 27 provides the responsibility for supervision, by designated

principals of member firms, to ensure compliance with all laws and regulations.  BFC

failed to comply with said rule.

---

arbitration.  A claim concerning these investments was filed in December, 2017.

25. BFC is responsible for the harm that Plaintiff suffered as a controlling person of Defendant Bartlett, and under the principals of agency and respondeat superior, as well as the Nevada Securities Laws. It is also directly liable as described above for its own negligence, recklessness, fraud, breach of fiduciary duty, deceit, and breach of contract in failing to supervise Bartlett.

26. As a matter of law, a broker-dealer is a controlling person of its registered representative both under Section 20(a) of the Exchange Act, <u>Hollinger v. Titan Capital Corp.</u>, 914 F.2d 1564, 1574 (9th Cir. 1990), and under the Nevada Securities Laws, as amended. Bartlett was admittedly a registered representative of BFC during the entire period in question. These facts are sufficient to show BFC's liability as a controlling person subject only to the affirmative defense of good faith. Id. at 1575. BFC carries the burden of proof of showing the affirmative defense of good faith. That showing requires that it prove that it maintained and enforced a reasonable and proper system of supervision and internal control and diligently enforced that system. Id. at 1576

27. Section 27(a) of the FINRA's Rules of Practice provides that: "Each member shall establish and maintain a system to supervise the activities of each registered representative and associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations, and with the rules of this Association. Final responsibility for proper supervision shall rest with the member. A member's supervisory system shall provide, at a minimum, for the following…

   a.   (6) Reasonable efforts to determine that all supervisory personnel are

qualified by virtue of experience or training to carry out their assigned responsibilities

28.  Section 27(c) of the FINRA's Rules of Practice provides that:

"Each member shall conduct a review, at least annually, of the business in which it engages, which review shall be reasonably designed to assist in detecting and preventing violations of and achieving compliance with applicable securities laws and regulations, and with the rules of the Association.  Each member shall review the activities of each office, which shall include the periodic examinations of customer accounts to detect and prevent irregularities or abuses."

<u>COUNT ONE - BREACH OF FIDUCIARY DUTY</u>

29.  Plaintiff incorporates paragraphs 1 through 28 above as though fully set forth herein.

30.  Bartlett owed Plaintiff a fiduciary duty pursuant to applicable statutes, rules and regulations, as well as under common law and industry standards of practice, including but not limited to recommending investments to the Plaintiff only after studying them sufficiently to become informed as to their nature, price and risks.

31.  Defendants were also obligated to inform Plaintiff of the risks involved in overconcentrating his retirement portfolio in high risk, illiquid investments, and obligated to inform Plaintiff of all other material facts concerning the transactions.

32.  Bartlett and BFC knew that Plaintiff was dependent on them to recommend investments that would provide income and growth for Plaintiff to rely on when he retired.  Plaintiff told Bartlett this repeatedly.  Rather than selecting investments consistent with these requirements, Defendant chose high risk, high commission

investments, then misrepresented their features, and their valuations to Plaintiff.

33.     Bartlett failed in each of his fiduciary obligations by offering and selling high risk, high commission, illiquid securities in transactions that over concentrated Plaintiff's portfolio in oil and gas and risky start up, private placement investments. Such over concentration was inconsistent with Plaintiff's investment objectives, and inconsistent with Bartlett's stated comments to Plaintiff that he would recommend a balanced, moderate risk portfolio for Plaintiff's retirement needs.

34.     In addition, Bartlett's practice of overstating investment values mislead Plaintiff, and prevented him from discovering earlier that the investments Bartlett had sold him were not worth nearly what was being represented on the spreadsheets.  Had Plaintiff known the values were over inflated he would have taken action to recover his losses sooner.

35.     As a result of his retirement accounts being over concentrated with these investments, Plaintiff lost a substantial amount of money.

36.     By reason of the hereinbefore alleged conduct, Bartlett breached his fiduciary duties to Plaintiff.

37.     As a direct and proximate result of Defendant's breach of their fiduciary duties, Plaintiff has damages entitling him to rescission of the disputed investments, or in the alternative, compensatory damages in an amount not less than $6,637,918

## COUNT TWO – MISREPRESENTATIONS AND OMISSIONS

38.     Plaintiff incorporates paragraphs 1 through 28 above as though fully set forth herein.

39.     At all times mentioned herein, Defendants engaged in an unlawful course of

15

conduct in which they knowingly and recklessly made representations and recommendations which induced Plaintiff into purchasing inappropriate, high risk, illiquid securities. These representations included that the investments and investment program that Bartlett was recommending and managing were tailored to Plaintiff's retirement needs and moderate risk tolerance.  This was false.

40.     Defendants knowingly and recklessly made false statements of material fact and omitted to state necessary material facts concerning the risks of purchasing these securities, their valuations and their prospects for success.  The intent of these misrepresentations was to sell high commission products to Plaintiff.

41.     In addition, Bartlett made misleading statements included that he (Bartlett) and BFC had independently performed an industry approved level of "due diligence" on the securities and found them safe, well managed, income generating investments. When Bartlett made these representations he had no basis for doing so, as such independent, professional due diligence had not been performed.  Instead, Bartlett made the representations with the intent to induce Plaintiff to enter into the purchase transactions.

42.     Plaintiff, at the time these representations were made by Defendants, was unaware of the falsity of Defendants' representations and believed them to be true and complete.  In reliance upon these representations, Plaintiff entered into these risky, illiquid securities transactions.  Had Plaintiff known the actual facts and risks, he would not have taken such actions.

43.     Defendants' material misrepresentations and omissions contained statements that if Plaintiff would follow the advice and recommendations of Defendants, his

principal would be preserved and Plaintiff would receive stable income and growth from the investments, as described above.  In fact, Defendants' advice and recommendations to Plaintiff was designed to serve only the interests of Defendants.

44.       Defendants also represented that they would exercise due care and diligence in monitoring Plaintiff's investments, and also represented that the valuations reported accurately reflected the current market value of the investments.  In fact, these representations were false.

45.       Defendants knew that the true purpose of the recommendations made to Plaintiff was to sell Plaintiff high commission investments that would earn them significantly greater compensation than had they recommended and built a more diversified, lower risk portfolio for Plaintiff.

46.       As a direct and proximate result of Defendants' misleading representations and omissions, Plaintiff suffered damages by losses of not less than $6,637,918

<u>COUNT THREE – NEGLIGENCE</u>

47. Plaintiff incorporates paragraphs 1 through 28 above as though fully set forth herein.

48. At all times described herein, Defendants owed Plaintiff a duty to act with reasonable care in the handling of his investments, said reasonable care being measured by the customary standards and practices of the securities industry. Defendants, however, have failed to act with such reasonable care, thereby causing Plaintiff actual damages.

49. Bartlett was aware that Plaintiff invested with BFC because he represented that they had carefully evaluated the DPP transactions and found them low  risk, income generating, professionally approved and managed investments.  In reality the transactions were structured to benefit the sponsors/issuers including  their affiliated

companies rather than the Plaintiff and other investors.

50. Bartlett also made wildly misleading representations on the returns Plaintiff could expect from the portfolio, then misrepresented the values of the investments on his spreadsheets, leaving Plaintiff with a false sense of security as to the value of his retirement portfolio.

51. Bartlett had no basis to make the representations as the transactions were "rubber stamped" by BFC with no meaningful, independent due diligence being performed on them. As a result Mr. Bartlett's recommendations resulted in substantial losses to Plaintiff and amounted to a breach of Bartlett's fiduciary duties to Plaintiff.

52. Furthermore BFC was negligent in failing to supervise Bartlett with respect to his handling of Plaintiff's investments. Specifically they failed to provide effective procedures to conduct a professional level of due diligence into the DPP investments, and further failed to provide effective staffing, sufficient resources and a system of follow up and review to determine that Bartlett was not over concentrating Plaintiff's accounts into these risky, illiquid investments, which were inconsistent with Plaintiff's investment objectives.

53. As a result, Bartlett engaged in the improper sales of securities as descried herein.

54. The failure to supervise Bartlett was negligent per se, and resulted in Bartlett over concentrating Plaintiff's accounts with overly risky private placements that had not been independently reviewed.

55. As a result of the negligence of Defendants, Plaintiff has suffered damages.

<u>COUNT FOUR - BREACH OF CONTRACT</u>

56. Plaintiff incorporates paragraphs 1 through 28, above, as though fully set forth herein.

57. In purchasing the DPP investments through BFC, Plaintiff entered into an agreement whereby BFC and Bartlett promised to abide by the rules and regulations of the NASD (FINRA), the NYSE and the securities laws then in effect in Nevada and the United States.

58. As part of these rules, BFC and Bartlett were obligated to make investment recommendations consistent with the needs and objectives of their client, the Plaintiff.

59. Also, in entering into a broker-client relationship with BFC, and agreeing to transfer his assets to BFC, Plaintiff expected BFC and Bartlett to perform their obligations consistent with the rules of the various exchanges, the SEC and the federal securities laws.  This was, in effect, the bargained for consideration in Plaintiff opening his accounts and making his investments.

60. BFC and Bartlett breached their obligations under the contract by failing to recommend investments and investment strategies consistent with Plaintiff's needs and objectives, as well as by over concentrating Plaintiffs portfolio in high risk, illiquid investments.

61. By way of this breach, Plaintiff suffered damages from the loss of the value of his investments in an amount not less than $6,637,918

////

Wherefore Plaintiff prays for a joint and several judgment against Defendants as follows:

FIRST CLAIM FOR RELIEF

1.      Damages in excess of $10,000.00;

2.      Attorneys' fees and costs;

3.      Punitive damages to be proven at trial; and,

4.      Such other and further relief as the Court deems just and proper

SECOND CLAIM FOR RELIEF

1.      Damages in excess of $10,000.00;

2.      Attorneys' fees and costs;

3.      Punitive damages to be proven at trial; and,

4.      Such other and further relief as the Court deems just and proper

THIRD CLAIM FOR RELIEF

1.      Damages in excess of $10,000.00;

2.      Attorneys' fees and costs;

3.      Punitive damages to be proven at trial; and,

4.      Such other and further relief as the Court deems just and proper

FOURTH CLAIM FOR RELIEF

1.      Damages in excess of $10,000.00;

2.      Attorneys' fees and costs;

3.      Such other and further relief as the Court deems just and proper

Dated: January 18, 2018        Respectfully submitted,

The Law Office of David Liebrader, Inc.

By: _____

David Liebrader
Attorney for Plaintiff

1

SUMM
DAVID LIEBRADER, ESQ.
STATE BAR NO. 5048
THE LAW OFFICES OF DAVID LIEBRADER, INC.
601 S. RANCHO DR. STE. D-29
LAS VEGAS, NV 89106
(702) 380-3131
Attorney for Plaintiff

2

3

4

5

6

DISTRICT COURT
CLARK COUNTY, NEVADA

7

8

9

10

11

12

13

14

15

16

IN THE MATTER BETWEEN

KEN LANDOW, KEN LANDOW IRA, KEN
LANDOW ASSOCIATES LIMITED
PARTNERSHIP,

PLAINTIFF,

v.

ALVERY A. BARTLETT, JR. AND BERTHEL
FISHER & COMPANY FINANCIAL SERVICES
INC.,

DEFENDANTS

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

SUMMONS

Case No. A-18-767962

Dept.: 29

17

**SUMMONS- CIVIL**

18

**NOTICE! YOU HAVE BEEN SUED.  THE COURT MAY DECIDE AGAINST YOU**

19

**WITHOUT YOUR BEING HEARD UNLESS YOU RESPOND WITHIN 20 DAYS.**

20

**READ THE INFORMATION BELOW.**

21

22

TO THE DEFENDANTS:  A civil complaint has been filed by the Plaintiff against you for the
relief set forth in the complaint.

23

24

    1.  If you intend to defend the lawsuit, within 20 days after this summons is served on

25

26

RECEIVED
FEB 06 2018
CLERK OF THE COURT

you, exclusive of the day of service, you must do the following:

    a.  File with the Clerk of this Court, whose address is shown below, a formal written response to the Complaint in accordance with the rules of the Court, with the appropriate filing fee.

    b.  Serve a copy of your response upon the attorney whose name and address is shown below.

2.  Unless you respond your default will be entered upon application of the Plaintiff and this court may enter a judgment against you for the relief demanded in the complaint, which could result in the taking of money or property or other relief requested in the Complaint.

3.  If you intend to seek the advice of an attorney in this matter, you should do so promptly so that your response may be filed on time.

4.  The State of Nevada, its political subdivisions, agencies, officers, employees, board members, commission members and legislators each have 45 days after service of this Summons within which to file an Answer or other responsive pleading to the Complaint.

Submitted by:

_____
Signature
David Liebrader
601 S. Rancho Dr. Ste D-29
Las Vegas, NV 89106
(702) 380-3131
Attorney for Plaintiff

Steven D. Grierson, Clerk of the Court

By:

Deputy Clerk       Date
Clark County Courthouse
200 Lewis Ave.
Las Vegas, NV 89155

**Note:  When service is by publication, add a brief statement of the object of the action.  See Nevada Rules of Civil Procedure 4(b)**

2