DAVID LIEBRADER, ESQ.
STATE BAR NO. NV 5048
THE LAW OFFICES OF DAVID LIEBRADER
601 S. RANCHO DR. STE. D-29
LAS VEGAS, NV 89106
PH: (702) 380-3131
Attorney for Plaintiff

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | | |
|---|---|---|
| IN THE MATTER BETWEEN | ) | Case No. 2:18-cv-00499 JAD- VCF |
| | ) | |
| KEN LANDOW, KEN LANDOW IRA, KEN | ) | AMENDED COMPLAINT |
| LANDOW ASSOCIATES LIMITED | ) | |
| PARTNERSHIP, | ) | |
| | ) | |
| PLAINTIFF, | ) | JURY TRIAL DEMANDED |
| v. | ) | |
| | ) | |
| ALVERY A. BARTLETT, JR. AND BERTHEL | ) | |
| FISHER & COMPANY FINANCIAL SERVICES | ) | |
| INC., | ) | |
| | ) | |
| DEFENDANTS. | ) | |
| | ) | |
| | ) | |

Plaintiff states his claim against the Defendants, jointly and severally, as follows:

<u>INTRODUCTION</u>

1.    Dr. Ken Landow ("Plaintiff" or "Dr. Landow") is a 70 year old man who lives in Las Vegas, Nevada.  Dr. Landow brings this claim individually, on behalf of his individual retirement account, and on behalf of his former medical practice: the Ken Landow Associates Limited Partnership.

2.    Defendant Alvery A. Bartlett Jr. ("Mr. Bartlett") was employed as a registered representative with Berthel Fisher & Company Financial Services, Inc. at the time of the transactions at issue in this claim.

3.      Defendant, Berthel Fisher & Company Financial Services, Inc. ("BFC") is a FINRA

licensed broker dealer doing business in the State of Nevada.

### FACTUAL BACKGROUND GIVING RISE TO THIS CLAIM

4.     This is an action for the recovery of investment losses.  There are twenty four

investments at issue; all are high risk, illiquid, direct participation program ("DPP")

private placement securities sold by Defendants to Plaintiff.  Some of the offerings

were managed by Mr. Bartlett himself.

5.   Plaintiff is a retired medical doctor living in Las Vegas, Nevada.  The investments at

issue are a series of transactions that Plaintiff made with Bartlett over the past 15 years

which were to provide for Plaintiff's retirement needs.

6.   Plaintiff was introduced to Defendant Bartlett in 2003 as a result of a referral from

Plaintiff's close friend and attorney Neil Galatz, another client of Mr. Bartlett's.

Plaintiff had just received an inheritance, and was looking for advice on how to invest

it.  Mr. Galatz suggested that he contact Mr. Bartlett, and from that point until 2017

Plaintiff was a client of Mr. Bartlett's, and until 2018, of Berthel Fisher's.

7.   Initially, Mr. Bartlett would call Plaintiff weekly, and in between Dr. Landow's busy

appointment schedule with patients, Plaintiff would take Mr. Bartlett's calls.

8.   Eventually, Mr. Bartlett started calling Plaintiff daily, and the relationship became akin

to a "student-pupil," with Mr. Bartlett educating Plaintiff on basic financial matters,

and Mr. Bartlett's economic philosophy.   During these calls Mr. Bartlett captivated

Plaintiff with stories of his success in the financial markets, as well as his previous

presidency of an offshoot of the NYSE.  He offered personal insights, and shared his

interactions with a wide array of prominent names from the world of Wall Street and

2

the elite of the investment industry.  Mr. Bartlett constantly talked about traveling to meetings with high ranking professionals ranging from named partners at PIMCO to large fund managers and international bankers. For example, famous Wall Street financier Nick Schorsch was the principal of many of the funds Mr. Bartlett invested in. For over 10 years Mr. Bartlett teased the merging of his hedge fund into entities affiliated with Mr. Schorsch. This greatly impressed Plaintiff, and lead to the high level of confidence and trust reposed in Mr. Bartlett and his abilities, with Plaintiff viewing Mr. Bartlett as part of his extended family.

9.  Through these conversations Mr. Bartlett persuaded Dr. Landow to turn over the management of his retirement assets to him and Berthel Fisher, and through privately managed investments with Mr. Bartlett taking on the role of manager.   Because of Dr. Landow's busy schedule, and the trust and confidence that Plaintiff reposed in Mr. Bartlett's expertise, a special, fiduciary relationship existed between the two men.

10. Mr. Bartlett told Plaintiff that the investments he would be recommending would provide the foundation for a secure retirement for Plaintiff.  Instead, these investments have  become largely worthless, and Plaintiff has been deprived of a substantial source of principal and income to provide for his retirement needs.

11. Unfortunately, while Dr. Landow viewed Mr. Bartlett as a trusted fiduciary,  Mr. Bartlett viewed Dr. Landow as nothing more than an investor to whom he could sell high commission investments, and other privately managed  investments that benefited Mr. Bartlett at the expense of Plaintiff.

12. Dr. Landow expressly told Mr. Bartlett on numerous occasions verbally and in writing that his investment objectives entailed purchasing "conservative/moderate" risk

investments, and that he wanted to avoid high risk and speculative investments. See Exhibit "A" attached. Mr. Bartlett promised Plaintiff that he would abide by those instructions.

13. Unfortunately, Mr. Bartlett failed to honor his promise to recommend only conservative/moderate risk investments consistent with Plaintiff's objectives. Instead, Mr. Bartlett sold Plaintiff high risk investments that he misrepresented at the point of sale, and constructed an investment portfolio of high risk, illiquid investments that was inconsistent with Plaintiff's stated conservative/moderate risk objectives.

14. At the time Dr. Landow was introduced to Mr. Bartlett he was running a busy dermatology practice in Las Vegas. For over 30 years his caring approach endeared him to several generations of Las Vegans, and he was asked to become the personal family physician for several of Las Vegas' influential families. His busy practice and obligations as a personal physician took up much of his free time, which lead to an increasing reliance on advice from Alvery Bartlett.

15. Throughout his career Dr. Landow regularly put aside funds for retirement, and it was these funds that Mr. Bartlett targeted for his private placement investment strategy.

16. From the beginning of the relationship in the early 2000s Dr. Landow told Mr. Bartlett that he wasn't looking for outsized returns. He told Mr. Bartlett that he was "married to his practice," and was looking to the money generated from the savings from his practice to provide a comfortable living in retirement.

17. Dr. Landow's risk tolerance was always "conservative/moderate" He didn't want to take excessive risk, and repeatedly told Mr. Bartlett so. Mr. Bartlett acknowledged these objectives and promised to abide by Plaintiff's wishes.

4

18. Mr. Bartlett described his investment approach as identifying and investing in stable, income producing investments in companies with strong balance sheets and dynamic, industry recognized CEOs. For every investment recommended Mr. Bartlett told Dr. Landow that he and BFC had carefully evaluated the sponsor and the transaction deal points, and found the investment terms extremely favorable, and consistent with Plaintiff's conservative/moderate risk investment objectives.

19. These statements were materially misleading, as neither Bartlett nor BFC fulfilled their FINRA obligations to conduct an independent, professional level of due diligence into the programs, and none of the investments can objectively be viewed as "conservative/moderate risk." For both Bartlett and BFC, these programs were nothing more than a way to increase fees and commissions by selling high commission, high fee investments to Dr. Landow.

20. Rather than disclose the fact that these investments were all high risks, Mr. Bartlett stressed to Dr. Landow that the transactions represented an opportunity to invest with some of the best operators in the oil and gas, real estate and technology industries, and that all of the sponsors had proven track records of success. What Mr. Bartlett intentionally failed to tell Plaintiff was that in addition to the high fees and high commissions, these were high risk, illiquid investments that were inconsistent with Plaintiff's stated investment objectives.

21. Unbeknownst to Plaintiff, BFC had internal policies that restricted the percentage of "direct participation programs" and private placements that an investor could invest in as a result of recommendations made by one of their registered representatives. This was to prevent a registered representative from over concentrating an investor's

portfolio in high risk, illiquid investments- exactly what Mr. Bartlett did with Dr. Landow's portfolio.

22. For each of the investments recommended to Plaintiff by Mr. Bartlett, Defendants were obligated pursuant to NASD (now FINRA) rules to recommend only "suitable investments" for Plaintiff's investment portfolio:

> **(a) In recommending to a customer the purchase, sale or exchange of any security, a member shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs.**
> **(b) Prior to the execution of a transaction recommended to a non-institutional customer, other than transactions with customers where investments are limited to money market mutual funds, a member shall make reasonable efforts to obtain information concerning:**
> **(1) the customer's financial status;**
> **(2) the customer's tax status;**
> **(3) the customer's investment objectives; and**
> **(4) such other information used or considered to be reasonable by such member or registered representative in making recommendations to the customer.**

NASD Rule 2310 Suitability

23. All of the investments described in paragraph 29, below were unsuitable for Plaintiff, in that they were all "high risk" investments, inconsistent with Plaintiff's stated objective of wanting "conservative/moderate risk" investments for his portfolio. Defendants had no basis to recommend high risk investments to Plaintiff, and by doing so they violated their industry suitability obligations, which is indicative of negligence.

24. Plaintiff was unaware that the investments were high risk, because prior to recommending each investment Mr. Bartlett falsely represented the investments as being "conservative/moderate risk" and therefore suitable for Plaintiff's portfolio. These were material misrepresentations, as these investments were all high risk, not

the conservative/moderate risk investments that Plaintiff specifically said he wanted to invest in.

25. Not only were the individual investments high risk and therefore unsuitable, the portfolio as a whole was unsuitable, concentrated in these high risk, illiquid investments that Mr. Bartlett falsely represented were safe, conservative/moderate risk investments selected for Plaintiff's retirement.

26. These misrepresentations as to safety were made during each and every recommendation by Mr. Bartlett, and relied upon by Dr. Landow in agreeing to make the investments.  These misrepresentations were then compounded by the false and misleading account valuation statements provided to Dr. Landow by Mr. Bartlett.  As a result of the false and misleading account valuation statements,  Dr. Landow was misled about the values of the investments purchased, which gave him a false sense of security to trust further recommendations by Mr. Bartlett.

27. All of the investment recommendations were made over the phone with Mr. Bartlett in his St. Louis office and Plaintiff in Las Vegas.  Mr. Bartlett occasionally would visit clients in Las Vegas and have dinner with Dr. Landow.  Over the years there may have been a dozen face to face meetings between the two men.

28. Mr. Bartlett told Plaintiff that the investments he offered had been vetted for "due diligence" on his part, and by BFC.  He said that unless the programs passed these stringent tests, he would not be allowed to sell them.

29. A brief description of the key points raised during the sales presentations are as follows:

**NYTROX EQUITY AND LOANS**

Mr. Bartlett first brought Nytrox to Plaintiff's attention in September, 2003 as a small environmental sensitive local company headquartered in the Las Vegas area. Mr. Bartlett said he believed so strongly in the company that he was taking a personal interest in it and helping the management. He would be introducing the company to investors both domestically and internationally. As the company evolved, Mr. Bartlett would call on Plaintiff to invest additional funds. Over time Mr. Bartlett became more involved in the management, and eventually moved the headquarters from Las Vegas to St. Louis where he could watch more closely over its progress. Eventually the company moved into the machine production shop of one of Mr. Bartlett's other clients.

Unfortunately after all the money Plaintiff invested, Mr. Bartlett decided Nytrox was taking too much of his time and he abandoned the project. With almost $1 million of Plaintiff's money invested in the company at Mr. Bartlett's request, the company entered a dormant phase. Mr. Bartlett would periodically say that when his hedge fund was fully active, he would resume his attention in Nytrox. Plaintiff only recently learned that Mr. Bartlett had written off his personal investment in the company.

**Contention**: This investment should not have been recommended by Mr. Bartlett because it is a high risk investment, inconsistent with Plaintiff's investment objectives. When soliciting the purchase Mr. Bartlett represented that this investment was a conservative/moderate risk investment, which was false and materially misleading. Plaintiff justifiably relied on this misrepresentation to his detriment, and suffered losses due to the high risk nature of the investment.

> **Amount invested: $860,000**
> **Date: August 11, 2003**
> **Status: current value $0**

### ABFM (The Alvery Bartlett Fund Management hedge fund)

In January 2004 Mr. Bartlett began discussing his hedge fund. He said he would have three separate funds running within 1-3 years. His collaborators and advisors included a who's who list of Wall Street illuminati ranging from Peter Arnot of PIMCO and John Hewitt of Goldman Sachs to John Horowitz of the New York Stock Exchange. The fund would be operated within his office as a broker-dealer of BFC. At Mr. Bartlett's suggestion, Plaintiff purchased shares in the fund in May, 2004.

He said he would not take any money out of the fund until all of the investors had received their money back. He also said he would purchase insurance for $1MM so that if he became infirm the investors funds would be safe. This was materially false and misleading.

In a meeting in Las Vegas in January 2017, Mr. Bartlett confessed that he used the funds Dr. Landow invested as a sort of piggy bank for his usual and customary office expenses for his Berthel employees – because otherwise he couldn't afford to pay them. He said he would repay ABFM for the money he used for non ABFM purposes

**Contention**: This investment should not have been recommended by Mr. Bartlett because it

is a high risk investment, inconsistent with Plaintiff's investment objectives.  When soliciting the purchase Mr. Bartlett represented that this investment was a conservative/moderate risk investment, which was false and materially misleading.  Plaintiff justifiably relied on this misrepresentation to his detriment, and suffered losses due to the high risk nature of the investment.

> **Amount invested: $400,000**
> **Date: May 12, 2004**
> **Status: current value$0**

## TWO HORSE

This was an investment project that Mr. Bartlett , his brother-in-law attorney Scott Faley, Neil Galatz and Dr. Landow participated in.  Mr. Bartlett was the manager and directed the placement of funds for investment.  The first project was Pickle, a company started by two friends of Mr. Bartlett's son.  Mr. Bartlett claimed to have mentored them, and said they were very successful in business.  Dr. Landow invested in their media and picture storage business, and later  invested in a company dealing with animation technology with Randy Smith on the board – the same operator of the Incite projects.  Another investment was in a company started by another friend of Mr. Bartlett , Tony Thompson, who was the operator of a large REIT corporation-  Thompson Properties and Triple Net.

**Contention**:  This investment should not have been recommended by Mr. Bartlett because it is a high risk investment, inconsistent with Plaintiff's investment objectives.  When soliciting the purchase Mr. Bartlett represented that this investment was a conservative/moderate risk investment, which was false and materially misleading.  Plaintiff justifiably relied on this misrepresentation to his detriment, and suffered losses due to the high risk nature of the investment.

> **Amount invested: $101,000**
> **Date: August 25, 2006**
> **Status: current value$0**

## FORMOSA

This was the name of an independent film produced by Will Tao that Mr. Bartlett somehow befriended.  Mr. Bartlett said the film would do well with PPV, TV, DVD, airplane and other merchandising.  He was so impressed with the film and its prospects he advised Dr. Landow to invest in it through Two Horse partners.  Mr. Bartlett also thought Dr. Landow should put additional money into Formosa after the film debuted in Los Angeles.

**Contention**:  This investment should not have been recommended by Mr. Bartlett because it is a high risk investment, inconsistent with Plaintiff's investment objectives.  When soliciting the purchase Mr. Bartlett represented that this investment was a conservative/moderate risk investment, which was false and materially misleading.  Plaintiff justifiably relied on this misrepresentation to his detriment, and suffered losses due to the high risk nature of the

investment.

>**Amount invested: $100,000**
>**Date: January 13, 2009**
>**Status: current value$0**

As a managing member of The Alvery Bartlett Fund Management Hedge Fund, Nytrox, Formosa and Two Horse, Mr. Bartlett owed a fiduciary duty to the corporations and its shareholders, including Plaintiff

As to the ABFM hedge fund, by charging Plaintiff a management fee of 20% of the profits and a 1.5% management fee, Mr. Bartlett took on the role of an investment advisor for which a fiduciary duty exists under Securities and Exchange Commission rules.

**Private Investments**

**INSITE I-4**

Mr. Bartlett told Plaintiff that Insite was an outdoor advertising company that would return anywhere between 2-4x of Plaintiff's original investment. Mr. Bartlett said the company offered the strongest balance sheet in the billboard industry. He claimed special knowledge of the company since its president was a good friend, and they had been involved in other business ventures together.

**Contention**: This investment should not have been recommended by Mr. Bartlett because it is a high risk investment, inconsistent with Plaintiff's investment objectives. When soliciting the purchase Mr. Bartlett represented that this investment was a conservative/moderate risk investment, which was false and materially misleading. Plaintiff justifiably relied on this misrepresentation to his detriment, and suffered losses due to the high risk nature of the investment.

>**Amount invested:$25,041**
>**Date: November 17, 2006**
>**Status: current value $0**

**INSITE I-5**

In December, 2007 Mr. Bartlett enthusiastically presented another investment in Insite. This time the investment was to run full cycle within 2-3 years. In the interim it would return 15-18%.

**Contention**: This investment should not have been recommended by Mr. Bartlett because it is a high risk investment, inconsistent with Plaintiff's investment objectives. When soliciting the purchase Mr. Bartlett represented that this investment was a conservative/moderate risk investment, which was false and materially misleading. Plaintiff justifiably relied on this

misrepresentation to his detriment, and suffered losses due to the high risk nature of the investment.

> **Amount invested: $175,000**
> **Date: January 9, 2008**
> **Status: current value$0**

**Real Estate Direct Participation Programs:**

**BEHRINGER HARVARD STRATEGIC OPPORTUNITY FUND**

Mr. Bartlett told Plaintiff he was intimately familiar with Behringer Harvard, and represented that they had done 15 deals since 1993 each with a 3-5 year time to sale with an average 45% ROI. He said the partnership would yield 7% and was a value added deal. It was to be a safe, well-funded REIT with downtown office space and provide liquidity within 5 years. In July 2005 Mr. Bartlett presented Behringer Harvard as an investment that had a 35 year track record without any loss. He suggested it would weather any downturn in the economy and would be good to diversify my portfolio. He presented this as a fantastic success that would pay a 4.4% return and be sold in 3 years. It went bankrupt

**Contention**: This investment should not have been recommended by Mr. Bartlett because it is a high risk investment, inconsistent with Plaintiff's investment objectives. When soliciting the purchase Mr. Bartlett represented that this investment was a conservative/moderate risk investment, which was false and materially misleading. Plaintiff justifiably relied on this misrepresentation to his detriment, and suffered losses due to the high risk nature of the investment.

> **Amount invested: $100,000**
> **Date: September 23, 2005**
> **Status: current value$0**

**KBS REIT I**

Mr. Bartlett was extremely excited about REITs and their ability to both provide a very stable, reliable source of income while at the same time growing in inherent value. He said he liked KBS I the most and thought it should be a base investment for Dr. Landow's portfolio. He thought the yield would be between 7-9% and that after 5-8 years the property would sell for much more than he invested in it. In October 2006 Mr. Bartlett proposed KBS-I as a very good, low risk investment with a fabulous outlook. He said the principal of the company, Peter Bren, was the brother of the developer of the Irvine Company in Newport Beach. A well respected developer and entrepreneur in his own right, Peter Bren had more than half a dozen projects run full cycle and all with a profit. Mr. Bartlett claimed a 7% rate of return with an overall 44 month full cycle. He claimed at that time that after the sale the full annualized rate of return would be 15%.

**Contention**: This investment should not have been recommended by Mr. Bartlett because it is a high risk investment, inconsistent with Plaintiff's investment objectives. When soliciting the purchase Mr. Bartlett represented that this investment was a conservative/moderate risk investment, which was false and materially misleading. Plaintiff justifiably relied on this misrepresentation to his detriment, and suffered losses due to the high risk nature of the investment.

> **Amount invested:$502,800**
> **Date: November 29, 2006 and January 25, 2007**
> **Status: current value$0**

## KBS REIT II

Mr. Bartlett was even more excited about this REIT. He told Dr. Landow that it had even greater potential that the first offering, and was already profitable since it was able to buy prestigious properties in New York and Washington at deeply discounted prices. He mentioned that they enjoyed a unique financing opportunity. As with KBS I this REIT would provide a stable source of income and sell at a considerable profit within a time range of 5-8 years. In August 2009 Mr. Bartlett presented KBS-II as a 93% occupied series of buildings with "A" rated tenants including in Washington, D.C. The investment was to generate an 8.5% dividend and run full cycle in 5-8 years with significant profit at that time. He believed this was the most spectacular investment ever.

**Contention**: This investment should not have been recommended by Mr. Bartlett because it is a high risk investment, inconsistent with Plaintiff's investment objectives. When soliciting the purchase Mr. Bartlett represented that this investment was a conservative/moderate risk investment, which was false and materially misleading. Plaintiff justifiably relied on this misrepresentation to his detriment, and suffered losses due to the high risk nature of the investment.

> **Amount invested: $330,000**
> **Date: September, 2009**
> **Status: current value:$120,000**

## APARTMENT TRUST OF AMERICA

Mr. Bartlett stated this REIT would provide a 6.5% annual income along with a solid investment in a stable and growing apartment market. He also told Dr. Landow that a "liquidity event" could occur with significant upside potential. Mr. Bartlett proposed this REIT in late December 2006 noting that it would provide a 6.5% annual income along with the potential for a liquidity event in the next 3-5 years that would significantly boost the overall rate of return on the investment. Mr. Bartlett was very familiar with the principals and fully endorsed the project as an avenue for growth and stability.

**Contention**: This investment should not have been recommended by Mr. Bartlett because it is a high risk investment, inconsistent with Plaintiff's investment objectives. When soliciting the purchase Mr. Bartlett represented that this investment was a conservative/moderate risk investment, which was false and materially misleading. Plaintiff justifiably relied on this misrepresentation to his detriment, and suffered losses due to the high risk nature of the investment.

> **Amount invested: $200,000**
> **Date: January 2, 2007**
> **Status: current value:$0**

### RESOURCE REAL ESTATE INVESTORS 7 LP

Mr. Bartlett stated that this investment would provide an 8% dividend with some of it tax advantaged. This was a company that purchased grade B rental property in grade A neighborhoods. After minimal renovation the rental value would be enhanced. According to Mr. Bartlett further adding to the safety of the company, it "cherry picked" the properties which were then purchased at a "steal". In June 2009 Mr. Bartlett proposed an investment in Resource since I did not have a sufficient number of apartments in my portfolio. This was to round out the portfolio. As an extra safety precaution the investment was sponsored by the Cohen family in Philadelphia that was also behind the Atlas projects. The investment was to yield 8% with 6.5% being tax free. The anticipated hold was 5-8 years after which the project was to be sold yielding an overall annualized income of between 13-15%.

**Contention**: This investment should not have been recommended by Mr. Bartlett because it is a high risk investment, inconsistent with Plaintiff's investment objectives. When soliciting the purchase Mr. Bartlett represented that this investment was a conservative/moderate risk investment, which was false and materially misleading. Plaintiff justifiably relied on this misrepresentation to his detriment, and suffered losses due to the high risk nature of the investment.

> **Amount invested: $100,000**
> **Date: August 31, 2009**
> **Status: loss $75,702**

### INLAND NATIONAL RETAIL DST

Mr. Bartlett said this was a "special investment" that was supposed to be advantageous by offsetting some previous investment tax losses that would have been otherwise wasted. It was supposed to be capable of a 1031 exchange and provide both stable income and growth. In March 2011 Mr. Bartlett suggested an investment in Inland National Retail DST since it would be able to withstand any downturn in the economy. The retail space in the projects was leases by such powerhouses as CVS, Walgreens and PetSmart. Five properties were to generate 7% income. At the end of the cycle the investment was to be the subject of a 1031 exchange.

**Contention**: This investment should not have been recommended by Mr. Bartlett because it is a high risk investment, inconsistent with Plaintiff's investment objectives. When soliciting the purchase Mr. Bartlett represented that this investment was a conservative/moderate risk investment, which was false and materially misleading. Plaintiff justifiably relied on this misrepresentation to his detriment, and suffered losses due to the high risk nature of the investment.

> **Amount invested: $250,000**
> **Date: April 1, 2011**
> **Current value:75,000**

## Oil and Gas Direct Participation Programs

### PDC 2006-P

Mr. Bartlett claimed this investment would provide tax advantaged income and was a good long term investment. Mr. Bartlett said he worked closely with management, and was especially pleased with the idea the company provided significant insurance so that investors could be general partners for the first year and then transfer to become limited partners afterward. At the end of July and early in August 2006, Mr. Bartlett presented the suggestion that Dr. Landow make a sizable investment in PDC. Mr. Bartlett said the project was good from both an investment and a tax standpoint. The major production was to be the first 7 years with significant income. Then there would be a moderate decrease but the revenue flow would continue for the next 30 years or so.

**Contention**: This investment should not have been recommended by Mr. Bartlett because it is a high risk investment, inconsistent with Plaintiff's investment objectives. When soliciting the purchase Mr. Bartlett represented that this investment was a conservative/moderate risk investment, which was false and materially misleading. Plaintiff justifiably relied on this misrepresentation to his detriment, and suffered losses due to the high risk nature of the investment.

> **Amount invested: $600,000**
> **Date: August 31, 2006**
> **Status: current value$0**

### ATLAS #17-2008

Mr. Bartlett was a firm believer in the various Atlas funds and its principals, the Cohen family of Philadelphia. The project was to provide significant tax advantages coupled with long term income and stability. In March 2008 Mr. Bartlett proposed another investment in Atlas. This was a Cohen family project that was to return 6-8 fold on the dollars invested. Mr. Bartlett noted it was located in the Marcellus Shale of Pennsylvania that had long proven reserves. Rather than performing as Mr. Bartlett had promised, the company never sold and recently filed for bankruptcy.

14

**Contention**: This investment should not have been recommended by Mr. Bartlett because it is a high risk investment, inconsistent with Plaintiff's investment objectives. When soliciting the purchase Mr. Bartlett represented that this investment was a conservative/moderate risk investment, which was false and materially misleading. Plaintiff justifiably relied on this misrepresentation to his detriment, and suffered losses due to the high risk nature of the investment.

> **Amount invested:$700,000**
> **Date: April 29, 2008**
> **Status: Loss: $491,750**

## ATLAS #18-2008

Mr. Bartlett was a firm believer in the various Atlas funds and its principals, the Cohen family of Philadelphia. The project was to provide significant tax advantages coupled with long term income and stability. In December 2008 Mr. Bartlett proposed another investment in a separate Atlas program. This one was to return 8% which after depletion allowance was to increase to 12-17%. Additionally it was to offer significant tax advantages. Mr. Bartlett noted that as with all of the Atlas programs it was so good that the Cohen family, owners of Atlas, even took a stake in the project.

**Contention**: This investment should not have been recommended by Mr. Bartlett because it is a high risk investment, inconsistent with Plaintiff's investment objectives. When soliciting the purchase Mr. Bartlett represented that this investment was a conservative/moderate risk investment, which was false and materially misleading. Plaintiff justifiably relied on this misrepresentation to his detriment, and suffered losses due to the high risk nature of the investment.

> **Amount invested: $250,000**
> **Date: January 15, 2009**
> **Status: loss $175,625**

## ATLAS #18-2009

This was another Atlas project. The project was to provide significant tax advantages coupled with long term income and stability. In early May 2009 Mr. Bartlett conferred with his ex-brother-in-law who happened to be both of Mr. Bartlett and Dr. Landow's tax attorney and recommended that Dr. Landow invest in the current Atlas project. Mr. Bartlett estimated a 10-15% return on my investment for the first 8 years after which the amount of gas from the wells was likely to be lessened in amount. During this later period extending up to 30 years the wells would continue to produce moderate income.

**Contention**: This investment should not have been recommended by Mr. Bartlett because it is a high risk investment, inconsistent with Plaintiff's investment objectives. When soliciting

the purchase Mr. Bartlett represented that this investment was a conservative/moderate risk investment, which was false and materially misleading. Plaintiff justifiably relied on this misrepresentation to his detriment, and suffered losses due to the high risk nature of the investment.

> **Amount invested: $700,000**
> **Date: June 30, 2009**
> **Status: loss $491,750**

## NOBLE ACCESS FUND V

Mr. Bartlett believed that this investment would "balance" Dr. Landow's portfolio with more oil and gas instead of real estate. Mr. Bartlett believed this was the best project in the industry, and told Dr. Landow that oil and gas was poised for a large advance. Mr. Bartlett had a long track record with this company, said he knew it well and was certain of its future. He would always speak glowingly of how Noble had the inside track on any royalty property that became available and how his was basically the only major independent firm in the business. Mr. Bartlett said this would be a solid investment with the customary parameters of return -- approximately 8-12% depending on the price of oil/gas.

**Contention**: This investment should not have been recommended by Mr. Bartlett because it is a high risk investment, inconsistent with Plaintiff's investment objectives. When soliciting the purchase Mr. Bartlett represented that this investment was a conservative/moderate risk investment, which was false and materially misleading. Plaintiff justifiably relied on this misrepresentation to his detriment, and suffered losses due to the high risk nature of the investment.

> **Amount invested: $200,000**
> **Date: January 22, 2010**
> **Status: current value:$0**

## NOBEL ACCESS FUND VII

This was a company related to others Mr. Bartlett previously sold to Dr. Landow. Mr. Bartlett said it would provide strong earnings and an 8% rate of return. He said there was the possibility of a 1 year "liquidity event" in which case Dr. Landow would get his money back with the additional profits from the sale. Mr. Bartlett suggested an 8% yield if natural gas would stay around $4 but could rise to about 12% if the price rose to between $6-7. The project was slated for a 40 year life, however at this time according to Mr. Bartlett, Exxon was buying properties and he estimated a one year liquidity event.

**Contention**: This investment should not have been recommended by Mr. Bartlett because it is a high risk investment, inconsistent with Plaintiff's investment objectives. When soliciting the purchase Mr. Bartlett represented that this investment was a conservative/moderate risk investment, which was false and materially misleading. Plaintiff justifiably relied on this misrepresentation to his detriment, and suffered losses due to the high

risk nature of the investment.

> **Amount invested: $200,000**
> **Date: June 10, 2010**
> **Status: current value$0**

## ATLAS SERIES 28-2010

According to Mr. Bartlett this was the best looking commodity company in the gas world.  Mr. Bartlett stated that the investment would provide a large cash flow over a prolonged time frame of up to 7 years after which the level of income would still be substantial but more moderate.

**Contention**:  This investment should not have been recommended by Mr. Bartlett because it is a high risk investment, inconsistent with Plaintiff's investment objectives.  When soliciting the purchase Mr. Bartlett represented that this investment was a conservative/moderate risk investment, which was false and materially misleading.  Plaintiff justifiably relied on this misrepresentation to his detriment, and suffered losses due to the high risk nature of the investment.

> **Amount invested: $700,000**
> **Date: June 15, 2010**
> **Status: loss $491,750**

## NOBLE ACCESS FUND VII

This investment was to provide a 7-9% yield with a good possibility of a "liquidity event" within the first year.  Mr. Bartlett stated that this investment was better than previous Noble offerings.  Even without a sale, the project was expected to continue providing revenue over a 40 year period.  Mr. Bartlett claimed extensive experience with this company, and convinced Dr. Landow of the safety and soundness of the investment.

**Contention**:  This investment should not have been recommended by Mr. Bartlett because it is a high risk investment, inconsistent with Plaintiff's investment objectives.  When soliciting the purchase Mr. Bartlett represented that this investment was a conservative/moderate risk investment, which was false and materially misleading.  Plaintiff justifiably relied on this misrepresentation to his detriment, and suffered losses due to the high risk nature of the investment.

> **Amount invested: $85,000**
> **Date: June 26, 2010**
> **Status: current value$0**

## NGAS PARTNERS 2010-A

17

Mr. Bartlett said that NGas was a big opportunity, and said the first batch of wells was better than anticipated. He told Dr. Landow to expect a "bonus" from the investment. Mr. Bartlett presented N-GAS as a replacement for Atlas since Atlas discontinued offering sales to retail clients. Mr. Bartlett claimed the investment would double in value over the next 5 years. There was to be an 8% rate of return during the interval prior to the ultimate sale of the project. According to him the project offered a big opportunity since the first wells looked better than anticipated. The project did not survive.

**Contention**: This investment should not have been recommended by Mr. Bartlett because it is a high risk investment, inconsistent with Plaintiff's investment objectives. When soliciting the purchase Mr. Bartlett represented that this investment was a conservative/moderate risk investment, which was false and materially misleading. Plaintiff justifiably relied on this misrepresentation to his detriment, and suffered losses due to the high risk nature of the investment.

> **Amount invested:$100,000**
> **Date: December 29, 2010**
> **Status: Loss $65,000**

## STRATEGIC ENERGY INCOME FUND I

Mr. Bartlett told Dr. Landow this investment would provide a safe income stream with tax advantaged earnings. It was not a buy and sell property but a long lasting fund that would continue to offer its benefits over many years. Mr. Bartlett discussed Strategic Energy Income Fund as a way to generate passive income. The project was to provide a 7% yield and offered the best risk adjusted ratio of any of the income producers and would offer income over a 30 year time frame.

**Contention**: This investment should not have been recommended by Mr. Bartlett because it is a high risk investment, inconsistent with Plaintiff's investment objectives. When soliciting the purchase Mr. Bartlett represented that this investment was a conservative/moderate risk investment, which was false and materially misleading. Plaintiff justifiably relied on this misrepresentation to his detriment, and suffered losses due to the high risk nature of the investment.

> **Amount invested: $500,000**
> **Date: March 17, 2011**
> **Current value:$100,000**

## NOBLE ACCESS FUND X

Mr. Bartlett stated this investment would provide long term income and safety with a 7-12% dividend. He believed that an eventual sale would provide a 3-4x return on the

original investment.  He had both ongoing and significant previous experience with this company and had Dr. Landow invest in several of the funds.  In early June 2011 Mr. Bartlett discussed another Noble project.  This one was to have a 7-12% rate or return without downside risk since there was to be no debt.  The project was to be about 75% natural gas and 25% oil.  Earnings were to be stable over a 7 year time frame but could go up if the resources became more precious.

**Contention**:  This investment should not have been recommended by Mr. Bartlett because it is a high risk investment, inconsistent with Plaintiff's investment objectives.  When soliciting the purchase Mr. Bartlett represented that this investment was a conservative/moderate risk investment, which was false and materially misleading.  Plaintiff justifiably relied on this misrepresentation to his detriment, and suffered losses due to the high risk nature of the investment.

**Amount invested: $500,000**
**Date: July 12, 2011**
**Status: current value$0**

**ATLAS SERIES 30-2011**

This was an investment Mr. Bartlett originally thought would not materialize.  He originally wanted Dr. Landow to invest $700,000 in the project, but it was oversold.  At BFC's urging the company accepted his $400,000.  Mr. Bartlett thought this project was better than the previous Atlas projects and said that 98% of the wells were good.  Mr. Bartlett had extensive experience with the company, knew the principals quite well.  As with other Atlas projects, Mr. Bartlett said the Cohen family had placed their personal money in the project.  It was to return significant tax advantages and cash flow.  Due to its conservative nature, the program was not to be risky.

**Contention**:  This investment should not have been recommended by Mr. Bartlett because it is a high risk investment, inconsistent with Plaintiff's investment objectives.  When soliciting the purchase Mr. Bartlett represented that this investment was a conservative/moderate risk investment, which was false and materially misleading.  Plaintiff justifiably relied on this misrepresentation to his detriment, and suffered losses due to the high risk nature of the investment.

**Amount invested: $400,000**
**Date: November 29, 2011**
**Status: Loss $281,000**

**Total loss: $6,906,418**

30. Based on Mr. Bartlett's representations that he and BFC had done an extensive due

diligence investigation into all of these investments, and found them to be "conservative/moderate risk," income producing investments with experienced management teams, Plaintiff agreed to purchase them in amounts largely determined by Mr. Bartlett.

31. In fact these were not "conservative/moderate risk" investments, and Mr. Bartlett's representations that they were, as well as his representations that that they had been properly vetted by BFC and Bartlett was false and materially misleading.

32. From the inception of the relationship Plaintiff believed Defendants were managing his investment portfolio consistent with his conservative/moderate risk objectives. This trust was misplaced due to an ongoing fraud perpetrated by Mr. Bartlett through the use of misleading account valuation statements. Mr. Bartlett used an excel spreadsheets program to generate misleading account statements, that misrepresented the values of Plaintiff's illiquid investments, using the purchase price as the "approximate value." These values were arbitrary, not based upon reliable estimations, and gave Plaintiff a false sense of security as to the value of his portfolio.

33. In fact, Mr. Bartlett regularly used these spreadsheets to mislead Plaintiff into believing that he would be able to redeem the investments for the amounts Mr. Bartlett cited on the spreadsheets.  Mr. Bartlett had no basis for using these values, as there was no public market for the investments.  As a result of using these fictitious valuations, Mr. Bartlett mislead Plaintiff, breached his fiduciary duty, and caused a delay in Plaintiff discovering his actual losses.

34. According to the spreadsheets Mr. Bartlett's office produced, Plaintiff's portfolio increased in value from $8,395,615 in 2006 to $12,909,428 in 2012.

35. These misleading valuations continued for several years until the July 29, 2015 valuation, which listed a large number of assets as being "not available." While that statement listed the amount invested as $13,592,223, it cited an approximate value of only $2,854,483.

36. When Plaintiff reviewed these figures he thought it strange that the investment values were suddenly "not available," so he called Mr. Bartlett and spoke with both him and his associate seeking an explanation. According to both Mr. Bartlett and his associate Adam Weinberger, new SEC and FINRA requirements did not allow broker dealers to place a value on the kind of investments (DPPs and private placements) that were in Plaintiff's portfolio. They then informed Plaintiff that industry rules required that they could only discuss the values with his accountant, and not with him.

37. Over the ensuing months Plaintiff's accountant, Dan Smith, had several conversations with Mr. Bartlett to try to determine the value of the investments. However, there remained many unanswered questions, so it was agreed that Mr. Bartlett would come to Las Vegas to meet with Mr. Smith and Plaintiff to clarify the situation.

38. When they finally met in January, 2017, Plaintiff's friend and local attorney Steve Parsons attended the meeting with Mr. Smith and Mr. Bartlett. The meeting quickly descended into an argument over the management of one of the investments; the Alvery Bartlett Fund Management investment, and the use of invested funds to pay Mr. Bartlett's office expenses and salaries, rather than for asset purchases. Ultimately this meeting adjourned after much acrimony without Mr. Bartlett being able to shed any light on Plaintiff's portfolio valuations.

39. The misleading account valuation statements are troubling for two reasons; one; they

lead Plaintiff to believe that the high risk, illiquid investments that Mr. Bartlett recommended to Plaintiff had significantly more value than would bring on the open market.  This mislead Plaintiff into believing the supposed "conservative/moderate risk" investments recommended had held their values, causing Plaintiff to continue to trust Mr. Bartlett and make further investment with him; second, the misleading values also prevented Plaintiff from discovering that he had suffered losses, and thereby delayed him from filing a claim for relief at an earlier date.

40. As a result of Defendants' over concentrating Plaintiff's portfolio into high risk, high commission private placements, Dr. Landow suffered substantial losses to his retirement portfolio.   As a result of these inappropriate investments Plaintiff has lost $6,906,418 as the investments have declined in value, shut down, filed for bankruptcy or remain illiquid, and Plaintiff is unable to redeem his interests.

41.   Plaintiff alleges on information and belief that each of the Defendants were at all times the agents of each of the other Defendants, and each of them was authorized to act as the principal or the agent of each other, and that the conduct referenced above was done by each of the Defendants in the course and scope of said agency and in the capacity of, and as principal or agent for each of the other Defendants.

<u>LEGAL BASIS UPON WHICH RELIEF SHOULD BE GRANTED</u>

<u>BFC'S RESPONSIBILITY TO SUPERVISE BARTLETT</u>

<u>Control Person Liability, Respondeat Superior, Agency, State Law Control Person</u>

42. At all times described herein, Bartlett was a duly licensed agent of BFC engaged in the purchase and sale of securities to the public.  As its agent, BFC had a duty to monitor and supervise the activities of Bartlett in his solicitations of security purchases.

43. As alleged herein, BFC failed to diligently supervise Bartlett.  FINRA Rules of Practice Section 27 provides the responsibility for supervision, by designated principals of member firms, to ensure compliance with all laws and regulations.  BFC failed to comply with said rule.

44. BFC is responsible for the harm that Plaintiff suffered as a controlling person of Defendant Bartlett, and under the principals of agency and respondeat superior, as well as the Nevada Securities Laws.  It is also directly liable as described above for its own negligence, recklessness, fraud, breach of fiduciary duty, deceit, and breach of contract in failing to supervise Bartlett.

45. As a matter of law, a broker-dealer is a controlling person of its registered representative both under Section 20(a) of the Exchange Act,   Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1574 (9th Cir. 1990), and under the Nevada Securities Laws, as amended.  Bartlett was admittedly a registered representative of BFC during the entire period in question.  These facts are sufficient to show BFC's liability as a controlling person subject only to the affirmative defense of good faith. Id. at 1575.  BFC carries the burden of proof of showing the affirmative defense of good faith.  That showing requires that it prove that it maintained and enforced a reasonable and proper system of supervision and internal control and diligently enforced that system.  Id. at 1576

46. Section 27(a) of the FINRA's Rules of Practice provides that: "Each member shall establish and maintain a system to supervise the activities of each registered representative and associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations, and with

the rules of this Association.  Final responsibility for proper supervision shall rest with the member.  A member's supervisory system shall provide, at a minimum, for the following…

    a.  (6) Reasonable efforts to determine that all supervisory personnel are qualified by virtue of experience or training to carry out their assigned responsibilities

47.  Section 27(c) of the FINRA's Rules of Practice provides that:

"Each member shall conduct a review, at least annually, of the business in which it engages, which review shall be reasonably designed to assist in detecting and preventing violations of and achieving compliance with applicable securities laws and regulations, and with the rules of the Association.  Each member shall review the activities of each office, which shall include the periodic examinations of customer accounts to detect and prevent irregularities or abuses."

<u>COUNT ONE - BREACH OF FIDUCIARY DUTY</u>

48. Plaintiff incorporates paragraphs 1 through 47 above as though fully set forth herein.

49. A fiduciary relationship existed between Plaintiff and Bartlett as a result of the long standing teacher-student relationship fostered by Mr. Bartlett; by the fact that Mr. Bartlett asked for, and was given the responsibility of managing Plaintiff's funds for retirement; by the fact that Mr. Bartlett was personally managing several of the investments (The Alvery Bartlett Fund Management hedge fund); as a result of the recommendation of Mr. Bartlett by Plaintiff's friend and attorney Neil Galatz; as a result of Mr. Bartlett recommending his brother in law as a tax attorney to answer Plaintiff's tax related questions on the investments recommended by Mr. Bartlett; and

from the fact that as a result of Plaintiff's busy work schedule, Plaintiff depended on the expertise provided for by Mr. Bartlett, and reposed full trust and confidence in him to manage his funds.

50. As a result of this special fiduciary relationship fostered by and voluntarily undertaken by Mr. Bartlett, Mr. Bartlett owed Plaintiff a fiduciary duty to recommend only investments consistent with Plaintiff's stated investment objectives of "conservative/moderate risk."

51. Defendants were also obligated to inform Plaintiff of the risks involved in overconcentrating his retirement portfolio in high risk, illiquid investments, and obligated to inform Plaintiff of all other material facts and risks concerning the transactions.

52. As fiduciaries, Defendants were also obligated to avoid conflicts of interests, which they failed to do by recommending the high risk private placements that paid correspondingly high commissions. It is a well-known fact in the securities industry that private placements are high risk, as were all of the DPPs and private placements sold to Plaintiff. It is also known that such high risk DPP investments pay a correspondingly high commission rate. Had Defendants fulfilled their fiduciary duty and followed Plaintiff's investment objectives, they would have recommended and sold conservative/moderate risk investments, with correspondingly lower commission structures.

53. Bartlett and BFC knew that Plaintiff was depending on them to recommend investments that would provide income and principal preservation for Plaintiff to rely on when he retired. Plaintiff told Bartlett this repeatedly. Rather than selecting

investments consistent with these requirements, Defendant chose high risk, high commission investments, then misrepresented their risks, and their valuations to Plaintiff.

54. Defendants breached their fiduciary duty by recommending investments that were unsuitable for Plaintiffs' stated needs and objectives; by recommending investments without regard to the concentration of asset class (illiquid, high risk direct participation programs) and by recommending the investments described in paragraph 29, above without a reasonable basis formed from conducting an independent, conflict free due diligence investigation into the investments prior to recommending them for purchase.

55. Bartlett over concentrated Plaintiff's portfolio in high risk start up, private placement investments. Such over concentration was inconsistent with Plaintiff's investment objectives, and inconsistent with Bartlett's stated comments to Plaintiff that he would recommend a balanced, conservative/moderate risk portfolio for Plaintiff's retirement needs.

56. In addition, Bartlett's practice of overstating investment values mislead Plaintiff, and prevented him from discovering earlier that the investments Bartlett had sold him were not worth nearly what was being represented on the spreadsheets. Had Plaintiff known the values were over inflated he would have taken action to recover his losses sooner.

57. Bartlett also voluntarily took on separate fiduciary duties when he persuaded Plaintiff to invest in the Alvery Bartlett Fund Management hedge fund, Nytrox, Formosa and Two Horse.

58. As a result of his retirement accounts being over concentrated with these investments, Plaintiff lost a substantial amount of money.

59. By reason of this conduct, Bartlett breached his fiduciary duties to Plaintiff.

60. As a direct and proximate result of Defendant's breach of their fiduciary duties, Plaintiff has suffered damages entitling him to rescission of the disputed investments, or in the alternative, compensatory damages in an amount not less than $6,906,418.

<u>COUNT TWO – FRAUD (INTENTIONAL MISREPRESENTATIONS)</u>

61. Plaintiff incorporates paragraphs 1 through 47 above as though fully set forth herein.

62. At all times mentioned herein, Defendants engaged in an unlawful course of conduct in which they supplied Plaintiff with false information about their intentions to construct and manage Plaintiff's investment portfolio.

63. Defendants knew that Plaintiff was investing for his retirement, and knew that Plaintiff's stated investment objective was to purchase investments that had conservative/moderate risk.

64. Defendants were aware of this because Plaintiff submitted numerous account related documents to BFC that indicated that Plaintiff's investment objective was "conservative/moderate risk."

65. Instead, Defendants disregarded these instructions, and recommended almost exclusively high risk private placement investments because doing so meant higher commissions for Defendants.

66. In his sales presentations to Plaintiff prior to each and every purchase Mr. Bartlett told Plaintiff that the investments met his "conservative/moderate risk" investment objective. In fact this was a material misrepresentation, as all of the investments recommend were high risk, and should never have been presented because they were inconsistent with Plaintiff's investment objectives.

67. Defendants made these false representations and material omissions with the intention of getting Plaintiff to purchase these high commission investments.

68. Plaintiff justifiably relied on Mr. Bartlett's misrepresentations and omissions due to the high level of trust that Plaintiff had in Mr. Bartlett.

69. BFC knew that Mr. Bartlett was recommending and selling investments inconsistent with Plaintiff's investment objectives, but because they shared in the high commissions generated they chose not to intervene.  This was a violation of their duties as FINRA members.

70. BFC also had a policy limiting the percentage of an investor's assets that could be invested in direct participation programs and private placements, but they chose to disregard the policy in favor of receiving the outsized commissions from the improper recommendations to Dr. Landow.

71. Defendants also supplied Plaintiff with false and misleading information concerning the value of Plaintiff's portfolio, which prevented him from learning the true value of the investments, and the losses he had suffered- thereby preventing Plaintiff from filing this action sooner.

72. Plaintiff justifiably relied to his detriment on the false representations of Defendants regarding honoring Plaintiff's investment objectives, the material omissions of the high risk nature of the investments, and the false values on the account summaries provided by Defendants. Bartlett told Plaintiff that Plaintiff could trust him to make recommendations that would be consistent with Plaintiff's conservative/moderate risk tolerance.  This was materially false and misleading.

73. In recommending investments that were far outside Plaintiff's stated risk tolerances

and investment objectives Defendants failed to exercise reasonable care or act consistent with NASD/FINRA rules regarding making suitable investment recommendations. Instead, Defendants told Plaintiff that the specific investments, as well as the portfolio constructed was consistent with Plaintiff's conservative/moderate risk investment objectives. Defendants knew or should have known that these representations were untrue, since the investments were all high risk and illiquid, and when combined into a single portfolio, represented a gross departure from the standard of care owed to Plaintiff under NASD/FINRA rules.

74. Defendants were further unjustified in communicating that the investments were conservative/moderate risk because they knew that they had not done an independent level of due diligence into the investments, instead relying on due diligence paid for by the sponsor of the investments. As a result of failing to conduct an independent review into the merits of the investments, Defendants supplied false and misleading information to Plaintiff when they told him that they had reviewed the investments and found them to be consistent with Plaintiff's investment objectives. Defendants knew they had no basis to make these representations to Plaintiff, and Plaintiff was unaware of the falsity of these representations. Nevertheless, based on the long-standing relationship, and the trust and confidence reposed in Defendants, Plaintiff agreed to follow Defendants' recommendations to his detriment. Had Plaintiff known that Defendants were providing him with false and misleading information concerning their investigations into the investments, and that the investments were inconsistent with his stated conservative/moderate risk tolerances he would not have made the investments.

75. Plaintiff, at the time these false representations and omissions of material fact, was unaware of the falsity of Defendants' representations and believed them to be true and complete.  In reliance upon these representations, Plaintiff entered into these high risk, illiquid securities transactions.  Had Plaintiff known the actual facts and risks, he would not have taken such actions.

76. Defendants knew that the true purpose of the recommendations made to Plaintiff was to sell Plaintiff high commission investments that would earn them significantly greater compensation than had they recommended and built a more diversified, lower risk portfolio for Plaintiff.

77. As a direct and proximate result of Defendants' misleading representations and omissions, Plaintiff suffered damages by losses of not less than $6,906,418.

## COUNT THREE – NEGLIGENCE

78. Plaintiff incorporates paragraphs 1 through 47 above as though fully set forth herein.

79. At all times described herein, Defendants owed Plaintiff a duty to act with reasonable care in making recommendations to purchase investments and in managing Plaintiff's investments, including truthfully representing the account values on periodic statements, said reasonable care being measured by the rules imposed by NASD and FINRA. Defendants, however, have failed to act with such reasonable care, thereby causing Plaintiff actual damages.

80. At all times relevant to the relationship, Plaintiff told Defendants that he had a conservative/moderate risk tolerance, and was looking to make investments that would preserve principal and provide for him in retirement.

81. As a result of Plaintiff's stated conservative/moderate investment objectives, and

pursuant to FINRA's rules, Defendants were obligated to recommend investments that had conservative/moderate risk profiles.

82. As described above, Defendants failed to recommend conservative/moderate risk investments thereby breaching their industry mandated obligation to follow Plaintiff's instructions and recommend investments consistent with his investment objectives. This breach of duty resulted in Plaintiff unknowingly being solicited to invest in high risk investments, which exposed Plaintiff to excessive risk that he was told he would be avoiding.  These excessive risks resulted in Plaintiff suffering losses when the risks were realized, which resulted in the failure of the investment programs.

83. Mr. Bartlett was further negligent by preparing misleading account valuation statements which improperly overstated the value of the investments he had previously recommended for purchase.

84. This had the effect of giving Plaintiff a false sense of security, which enabled Bartlett to sell Plaintiff more high commission investments.

85. Bartlett knew or should have known that the values being represented on the account summaries were misleading, and that Plaintiff would be relying on them when making decisions to follow Bartlett's future recommendations.

86. BFC was negligent by permitting the overconcentration of DPPs and private placements in Dr. Landow's accounts, in violation of their own rules, and by failing to provide effective staffing, sufficient resources and a system of follow up and review to prevent Bartlett from over concentrating Plaintiff's accounts into these risky, illiquid investments, which were inconsistent with Plaintiff's investment objectives.

87. BFC was further negligent by failing to conduct a professional level of independent

31

due diligence into the DPP investments.  Plaintiff was entitled to rely on BFC honoring their industry obligations to perform such due diligence, and Bartlett specifically told him during each and every solicitation that he and BFC had investigated the investments, and that they were consistent with Plaintiff's objective of moderate risk.

88.  In reality Defendants did not conduct an independent due diligence investigation,  and Mr. Bartlett's recommendations of these high risk investments resulted in substantial losses to Plaintiff and amounted to a breach of Bartlett's fiduciary duties to Plaintiff.

89.  The failure to conduct due diligence into the investments, and the failure to prevent Mr. Bartlett from sending out his own bogus account valuation statements was negligent per se, and resulted in Bartlett over concentrating Plaintiff's accounts with overly risky private placements that had not been independently reviewed.

90. As a result of the negligence of Defendants, Plaintiff has suffered damages.

<u>COUNT FOUR - BREACH OF CONTRACT</u>

91. Plaintiff incorporates paragraphs 1 through 47, above, as though fully set forth herein.

92. In opening an account with BFC and Bartlett,  Plaintiff entered into an agreement whereby BFC and Bartlett promised to abide by the rules and regulations of the NASD (FINRA), the NYSE and the securities laws then in effect in Nevada and the United States. See Exhibit "A" attached.

93. Both BFC and Bartlett agreed to abide by the NASD/FINRA Rules as a member (BFC) and associated person (Mr. Bartlett), at the time they advised, recommended, and sold the Securities to Plaintiff.  Thus, BFC and Mr. Bartlett were obligated to abide by and comply with the NASD Rules (2310 & 3010), FINRA Rules (2110, 2210,

& 3170), the NTMs (03-49, 03-71, 05-18, 10-22, 96-60) as a broker-dealer selling securities in this state, and required to act with the "utmost good faith and integrity" and "just and equitable principals of trade."

94. These rules were promulgated for the benefit of the customers of broker dealers that purchase investments based upon recommendations made by the broker dealers and associated persons.

95. Plaintiff was justified in relying upon BFC's agreement to abide by NASD and FINRA rules, specifically, making suitable investments consistent with Plaintiff's stated investment objectives, and performing a professional independent due diligence investigation into the investments recommended.

96. In entering into a broker-client relationship with BFC, and agreeing to transfer his assets to BFC, Plaintiff expected BFC and Bartlett to perform their obligations consistent with NASD/FINRA rules, the SEC and the federal securities laws. This was, in effect, the bargained for consideration in Plaintiff opening his accounts and making his investments.

97. BFC and Bartlett should have known that it was foreseeable that Plaintiff would rely on Defendants promises to manage his investment portfolio consistent with FINRA rules pertaining to customers.

98. In failing to honor their suitability obligations and their due diligence obligations as FINRA members, BFC and Bartlett breached their agreement to abide by FINRA rules to which Plaintiff, as Defendants' customer, was an intended third party beneficiary.

99. BFC and Bartlett breached their obligations under the contract by failing to recommend investments and investment strategies consistent with Plaintiff's needs

and objectives, by failing to conduct independent due diligence into the investments recommended, as well as by over concentrating Plaintiffs portfolio in high risk, illiquid investments.

100.     By way of this breach, Plaintiff suffered damages from the loss of the value of his investments in an amount not less than $6,906,418.

////

Wherefore Plaintiff prays for a joint and several judgment against Defendants as follows:

### FIRST CLAIM FOR RELIEF

1.     Damages in excess of $10,000.00;

2.     Attorneys' fees and costs;

3.     Punitive damages to be proven at trial; and,

4.     Such other and further relief as the Court deems just and proper

### SECOND CLAIM FOR RELIEF

1.     Damages in excess of $10,000.00;

2.     Attorneys' fees and costs;

3.     Punitive damages to be proven at trial; and,

4.     Such other and further relief as the Court deems just and proper

### THIRD CLAIM FOR RELIEF

1.     Damages in excess of $10,000.00;

2.     Attorneys' fees and costs;

3.     Punitive damages to be proven at trial; and,

4.     Such other and further relief as the Court deems just and proper

# FOURTH CLAIM FOR RELIEF

1.      Damages in excess of $10,000.00;

2.      Attorneys' fees and costs;

3.      Such other and further relief as the Court deems just and proper

Dated: March 14, 2019        Respectfully submitted,

                           The Law Office of David Liebrader, Inc.

                           By: _____
                           David Liebrader
                           Attorney for Plaintiff

# EXHIBIT "A"



**BERTHEL FISHER & COMPANY**
Financial Services, Inc.
Member NASD/SIPC

August 24, 2005

R Kenneth Landow
~~██████████████~~
Las Vegas, NV  89109-1507

Dear Client,

At Berthel Fisher & Company Financial Services, Inc. we appreciate your business and are committed to providing you with quality financial products to help meet your goals and objectives. We have recently received a New Account/Suitability Form which our registered representative completed with you and it is used to both open an account and update information that you currently have on file with us.

In accordance with the Securities and Exchange Commission Rules, we wish to confirm the information we have on file for you. We ask that you carefully review the attached information to verify that it is correct or to provide any information that may be missing. If information is marked "Not Required", then you do not need to supply us with the information. This information is referenced when transactions are reviewed to help ensure each transaction is suitable for you. Enclosed with this letter is helpful information containing definitions on some of the terms used along with a copy of our Privacy Policy and Business Continuity Plan.

In future years, we will ask you to update your information with your representative as your information changes so that we have an accurate picture of your financial situation upon which to base financial recommendations. Whenever you notify us of a change, we will send you a confirmation for verification. For further clarification regarding any of the information contained in this letter and how it relates to your financial situation, please contact your registered representative. Again, we thank you for allowing our registered representative and Berthel Fisher & Co. Financial Services Inc. to assist you in meeting your financial needs.

Respectfully,

Client Relations

---

701 Tama Street, Building B
P.O. Box 609
Marion, IA  52302-0609
319.447.5700
800.356.5234
F: 319.447.4250

**WHERE INDEPENDENCE MATTERS**
www.berthel.com

**BFC-LANDOW002086**



**BERTHEL FISHER & COMPANY**
Financial Services, Inc.
Member NASD/SIPC

August 24, 2005

If the information below is both complete and correct, no response is necessary.  If you need to make a correction or update your information, please make your corrections next to the incorrect information, sign and return it to Berthel Fisher & Co. Financial Services, Inc.  Attention: Compliance Department, P.O. Box 609, Marion, IA 52302-0609.

**Your Registered Representative is:  Alvery Bartlett, Jr.**

**Registration Names:**          R Kenneth Landow

**Legal Address:**          ████████████████

                                  Las Vegas, NV  89109-1507

**Home Phone #:**          702-732-████

**Work Phone #:**          702-451-3████

**Occupation:**          OWNER/PHYSICIAN

**Annual Income:**          $1,000,001 and above

**Net Worth:**          $ 1,000,001 and above

**Liquid Assets:**          $ 1,000,001 and above

**You are of Legal Age:**          Yes

**Investment Objective:**          Growth &  Income

**Investment Experience:**          Limited Partnerships: N/A, Options: 21 and above, Mutual Funds: 21 and above, Annuities: N/A, Bonds: 21 and above, Stocks: 21 and above

**Risk Tolerance:**          Moderate

**Investment Time Horizon:**          6 - 10 years

**Has Discretion Been Granted?:**          No

Signature Required if Corrections:          _____

                                                                                    (Date)

_____

                                                                                    (Date)

701 Tama Street, Building B
P.O. Box 609
Marion, IA  52302-0609
319.447.5700
800.356.5234
F: 319.447.4250

**WHERE INDEPENDENCE MATTERS**
www.berthel.com

BFC-LANDOW002087



**BERTHEL FISHER & COMPANY**
Financial Services, Inc.
Member NASD/SIPC

November 14, 2005

R Kenneth Landow Md Ltd Profit Sharing Tr 8-15-03
R Kenneth Landow
~~█████████████████~~
Henderson, NV  89014-7632

Dear Client,

At Berthel Fisher & Company Financial Services, Inc. we appreciate your business and are committed to providing you with quality financial products to help meet your goals and objectives.  We have recently received a New Account/Suitability Form which our registered representative completed with you and it is used to both open an account and update information that you currently have on file with us.

In accordance with the Securities and Exchange Commission Rules, we wish to confirm the information we have on file for you.  We ask that you carefully review the attached information to verify that it is correct or to provide any information that may be missing. If information is marked "Not Required", then you do not need to supply us with the information.  This information is referenced when transactions are reviewed to help ensure each transaction is suitable for you.   Enclosed with this letter is helpful information containing definitions on some of the terms used along with a copy of our Privacy Policy and Business Continuity Plan.

In future years, we will ask you to update your information with your representative as your information changes so that we have an accurate picture of your financial situation upon which to base financial recommendations.  Whenever you notify us of a change, we will send you a confirmation for verification.  For further clarification regarding any of the information contained in this letter and how it relates to your financial situation, please contact your registered representative.  Again, we thank you for allowing our registered representative and Berthel Fisher & Co. Financial Services Inc. to assist you in meeting your financial needs.

Respectfully,

Client Relations

701 Tama Street, Building B
P.O. Box 609
Marion, IA  52302-0609
319.447.5700
800.356.5234
F: 319.447.4250

WHERE INDEPENDENCE MATTERS
www.berthel.com

BFC-LANDOW002088



**BERTHEL FISHER COMPANY**
*Financial Services, Inc.*
*Member NASD/SIPC*

November 14, 2005

If the information below is both complete and correct, no response is necessary.  If you need to make a correction or update your information, please make your corrections next to the incorrect information, sign and return it to Berthel Fisher & Co. Financial Services, Inc.  Attention: Compliance Department, P.O. Box 609, Marion, IA 52302-0609.

**Your Registered Representative is:  Alvery A Bartlett, Jr.**

| | |
|---|---|
| **Registration Names:** | R Kenneth Landow Md Ltd Profit Sharing Tr 8-15-03 |
| | R Kenneth Landow |
| **Legal Address:** | ▇▇▇ Warm Spring Rd , Ste 102 |
| | Henderson, NV  89014-7632 |
| **Home Phone #:** | 702-732-▇▇▇ |
| **Work Phone #:** | 702-451-▇▇▇ |
| **Occupation:** | OWNER |
| **Annual Income:** | $ 200,001 - 500,000 |
| **Net Worth:** | $ 1,000,001 and above |
| **Liquid Assets:** | $ 1,000,001 and above |
| **You are of Legal Age:** | Yes |
| **Investment Objective:** | Growth &  Income |
| **Investment Experience:** | Limited Partnerships: N/A, Options: 21 and above, Mutual Funds: 21 and above, Annuities: N/A, Bonds: 21 and above, Variable Contracts: N/A, Stocks: 21 and above |
| **Risk Tolerance:** | Conservative |
| **Investment Time Horizon:** | 6 - 10 years |
| **Has Discretion Been Granted?:** | No |

Signature Required if Corrections: _____

(Date)

_____

(Date)

701 Tama Street, Building B
P.O. Box 609
Marion, IA  52302-0609
319.447.5700
800.356.5234
F:  319.447.4250

WHERE INDEPENDENCE MATTERS
www.berthel.com

BFC-LANDOW002089





*Reference* #: bf41011148101339

November 27, 2017

ı|lıın⋅ı|ı|||⋅||⋅|ıᵸılᵸ⋅ıll⋅ıᵸı|ıᵸ||ı|ı|ᵸ||ı|ıᵸᵸ||||ıᵸlᵸ|ᵸ|ᵸ|

**********AUTO**MIXED AADC 522
R. Kenneth Landow MD LTD Benefit Trust          T12  P1
employees of Ken Landow
█████Alta Drive, Ste 120
Las Vegas, NV 89145-8728

Dear Client,

At Berthel Fisher & Company Financial Services, Inc. we appreciate your business and are committed to providing you with quality financial products to help meet your goals and objectives. We have received a Client Acc ount Form that our registered representative completed with you and it is used to both open an account and update information that you currently have on file with us.

In accordance with the Securities and Exchange Commission Rules, we wish to confirm the  information we have on file for you. We ask that you carefully review the attached information to verify that it is correct or to provide any information that may be missing. If information is marked "Not Required", then you do not need to supply us with t he information. This information is referenced when transactions are reviewed to help ensure each transaction is suitable for  you. Enclosed with this letter is helpful information containing definitions on some of the terms used along with a copy of our Privacy Policy and Business Continuity Plan.

In the future, we will ask you to update your information with your representative as your inf ormation changes so that we maintain an accurate picture of your financial situation upon which to base financial reco mmendations. Whenever you notify us of a change, we will send you a confirmation for verification. For further clarification regarding any of the information contained in this letter and how it relates to your financial situation, please contact your regis tered representative. Again, we thank you for allowing our registered representative an d Berthel Fisher & Company Financial Services, Inc. to assist you in meeting your financial needs.

Respectfully,

Client Relations



**BERTHEL FISHER & COMPANY**
Financial Services, Inc.
Member FINRA/SIPC

*Reference #:* bf41011148101339

If the information below is both complete and correct, no response is necessary. If you need to make a correction or update your information, please make your corrections next to the incorrect information, sign and return it to Berthel Fisher & Company Financial Services, Inc. Attention: Client Services, 4201 42nd St NE, Suite 100, P.O. Box 11340, Cedar Rapids, IA 52410-1340.

## ENTITY ACCOUNT INFORMATION:

| | |
|---|---|
| **Entity Name:** | R. Kenneth Landow MD LTD Benefit Trust |
| **Registration:** | Profit Sharing Plan Non-Prototype |
| **For the Benefit Of** | employees of Ken Landow |
| **Your Registered Rep:** | Alvery Bartlett |

## AUTHORIZED INDIVIDUALS FOR THIS ACCOUNT

| | |
|---|---|
| **NAME** | R. Kenneth  Landow |
| **Type:** | Trustee |
| **Legal Address:** | ~~▓▓▓~~ Bel Air Dr. Unit 24A |
| | Las Vegas, NV 89109- |

| | |
|---|---|
| **NAME** | |
| **Type:** | |
| **Legal Address:** | |

| | |
|---|---|
| **NAME** | |
| **Type:** | |
| **Legal Address:** | |

## COMBINED FINANCIAL INFORMATION FOR THE ENTITY:

| | |
|---|---|
| **Income:** | $115,000 |
| **Net Worth (Excluding Residence):** | $2,800,000 |
| **Net Worth (Including Residence):** | $2,800,000 |
| **Liquid Assets:** | $1,400,000 |
| **Liquidity Needs:** | Does Not Matter |
| **Federal Tax Bracket:** | -1 |
| **Annual Expenses:** | Under $50,000 |
| **Special Expenses:** | |
| **Time Frame for Special Expenses:** | |



*Reference #:* bf41011148101339

## INVESTMENT PROFILE:

| | |
|---|---|
| **Investment Objectives:** | Growth and Income |
| **Risk Tolerance:** | Moderate |
| **Investment Time Horizon:** | Intermediate: 6 to 10 Years |
| **Investment Purpose:** | Save for Retirement, Accumulate Wealth, Market Speculation |
| **General Investment Knowledge:** | Good |
| **Decision-Making Experience:** | I consult with my broker., I make my own decisions., I consult with family/frien |

| *Focused Risk Tolerance:* | | | |
|---|---|---|---|
| *Aggressive:* | Up to 50% | *Moderately Aggressive:* | Up to 50% |
| *Moderate:* | Up to 50% | *Moderately Conservative:* | Up to 50% |

## INVESTMENT PRODUCT KNOWLEDGE *(Based on combined knowledge of all Authorized Individuals)*:

| *Investment Type* | *Experience Level* | *Years of Experience* |
|---|---|---|
| **Stocks:** | Good | 10 |
| **Bonds:** | Good | 10 |
| **Cash/Money Market:** | Good | 10 |
| **Mutual Funds:** | Good | 10 |
| **Options:** | None | 0 |
| **Limited Partnerships:** | Good | 10 |
| **Variable Annuities:** | None | 0 |
| **Futures:** | None | 0 |
| **Fixed Annuities:** | None | 0 |
| **Alternative Investments:** | Good | 10 |
| **Margin:** | None | 0 |
| **Foreign Currency:** | None | 0 |
| **Foreign Securities:** | None | 0 |

## SIGNATURES REQUIRED IF CORRECTIONS:

If you made any corrections or updates to your information, please sign below and return a copy of this form to Berthel Fisher & Company Financial Services, Inc. Attention: Client Services, 4201 42nd St NE, Suite 100, P.O. Box 11340, Cedar Rapids, IA 52410-1340.

| | | |
|---|---|---|
| *NAME AUTHORIZED ACCOUNT SIGNER (PRINT)* | *SIGNATURE* | *DATE* |

| | | |
|---|---|---|
| *NAME AUTHORIZED ACCOUNT SIGNER (PRINT)* | *SIGNATURE* | *DATE* |

# Berthel Fisher & Company Financial Services, Inc. Client Agreement

This Client Agreement (the "Agreement") between Berthel Fisher & Company Financial Services, Inc., ("BFCFS") and the undersigned ("undersigned" or "you") sets forth the terms and conditions that govern any and all of your account(s) ("Account") with BFCFS and the transaction of business in your Accounts. The undersigned represents and agrees as follows:

1. BFCFS has executed a Clearing Broker-Dealer Agreement with National Financial Services, LLC, referred to herein as "Clearing Firm", as clearing agent. BFCFS is an express and intended third party beneficiary of any agreements you execute with the Clearing Firm, including but not limited to all forms, documents, and other agreements relating to your Accounts, the terms of which are incorporated herein. In the event of conflict between the provisions of this Agreement and agreements you execute with the Clearing Firm, the Clearing Firm agreements shall prevail. You acknowledge that you have appointed BFCFS as your exclusive agent with respect to all matters regarding your Account, including but not limited to the placing of securities purchase and sale orders and delivery of margin and option instructions, if authorized.

2. All transactions executed in the Account shall be subject to the rules, regulations, customs, and usages of the exchange, market, or Clearing Firm where executed, and to all applicable federal and state laws and regulations, including the rules of FINRA.

3. You acknowledge that you are responsible for providing truthful and accurate information on the Client Account Form, such as your address, telephone number, financial circumstances, investment goals and experience and further that BFCFS is relying on that information to make recommendations to you. You agree to notify BFCFS promptly in writing of any change in this information.

4. BFCFS is not bound to execute any orders until accepted by BFCFS.

5. If the Account is a joint account, the liability of the undersigned with respect to the Account shall be joint and several, and any Accounts owned by one or more of the undersigned shall be subject to a lien in BFCFS's favor, such lien to be in addition to, and not in substitution of the rights and remedies BFCFS would have otherwise. Unless you have notified BFCFS in writing and have provided required documentation, this Account shall be held by the undersigned, jointly with rights of survivorship. Each joint tenant irrevocably appoints the other as attorney- in-fact to take all action on his or her behalf and to represent him or her in all aspects in connection with this Agreement. BFCFS shall be justified and fully protected in acting upon the instructions of either of you.

6. If you do not pay in full for any security purchased for this Account or do not deliver any security sold for this Account on or before the settlement date, or there has been an error in the Account, then BFCFS is authorized to take all steps necessary to complete the transaction, in which event you will reimburse BFCFS for all costs, losses, or liabilities it incurs. In the event there is a gain as the result of an error, BFCFS shall retain the profit.

7. BFCFS is authorized, in its discretion and without notice, to cancel any outstanding orders, in order to close out the Accounts, in whole or in part, or to close out any commitment made on your behalf, in the event of the death of any of the undersigned or for any reason whatsoever, if BFCFS deems it necessary.

8. Any securities you request BFCFS to sell will be fully and freely marketable and free from liens of any kind, unless written notice to the contrary is given to BFCFS at the time such order is placed.

9. BFCFS shall not be liable for losses caused directly or indirectly by conditions commonly known as "Acts of God", by government restrictions, exchange or market rulings, suspension of trading, unusual market conditions, war, strikes, natural disasters, telephone or computer system failures, extreme market volatility, trading volume and/or other conditions beyond its control.

10. In the event you become indebted to BFCFS in the course of operation of this Account, you will repay such indebtedness upon demand. If after demand, you fail to pay the indebtedness, BFCFS may liquidate the Account in an amount sufficient to satisfy your indebtedness and/or at its option close your Account. You shall reimburse BFCFS for the reasonable costs of the collection of any unpaid amount in your Account, including attorney's fees.

11. In the event your Registered Representative is no longer associated with BFCFS, BFCFS may at its option: (i) assist you in finding another BFCFS Registered Representative to service your account; (ii) may request that you transfer the account away from BFCFS within 30 days of the request and/or (iii) upon notice, liquidate and/or close the account.

12. Communications directed to you at the address specified hereon, whether via certified mail, regular mail, regular commercial carrier, fax or at the email address specified hereon, shall be deemed to have been personally delivered to you, within 3 days of delivery to the respective carrier, and you agree to waive all claims resulting from failure to receive such communications.

13. This Agreement and its provisions shall be continuous and shall inure to the benefit of BFCFS and any successor or assigns and shall be binding upon you and/or your estate, heirs, executors, administrators, assigns, directors, officers, shareholders, partners, agents, finders, employees, and/or controlling persons.

14. BFCFS may electronically record any of our telephone conversations and you consent to such recording.

15. BFCFS may modify the terms of this Agreement at any time upon prior written notice to you. By continuing to accept services from BFCFS thereafter, you will have indicated your acceptance of any such modification. If you do not accept such modification, you must notify BFCFS in writing and at its option your account may then be liquidated and closed by BFCFS.

16. Sales on Military Installations: It is important to note that securities offered by the firm are not being offered or provided on behalf of the federal government, and that the offer of such securities is not sanctioned, recommended or encouraged by the federal government.

17. To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions (including broker-dealers) to obtain, verify, and record information that identifies each person who opens an account, which is why when you opened the Account, you were asked for your name, address, date of birth, and other information that will allow BFCFS to identify you. Your Registered Representative may also ask to see or request a copy of your driver's license or other identifying documents.

18. For some mutual funds and variable annuities, BFCFS receives compensation in addition to the sales concession. The amount of compensation is based on BFCFS's total sales of these products. For more information, you may ask your Registered Representative for an explanation. For more information, visit www.berthel.com.

19. BFCFS and your Clearing Firm are members of the Securities Investor Protection Corporation ("SIPC"). Your Accounts are covered by SIPC. SIPC coverage is not the same as FDIC insurance. In the event of a firm's failure, SIPC protects securities customers, of its members, for up to $500,000 (including $100,000 for claims for cash). An explanatory brochure is available upon request or at www.sipc.org. If your Account is carried by a Clearing Firm, it also receives excess SIPC protection up to the Clearing Firm's net equity for cash and securities. Neither SIPC coverage nor excess SIPC coverage applies to market losses.

20. This Agreement and all transactions made in your account shall be governed by the laws of the state of Iowa.

**21. Arbitration: This agreement contains a pre-dispute arbitration clause. By signing an arbitration agreement, the parties agree as follows:**

A. **All parties to this agreement are giving up the right to sue each other in court, including the right to a trial by jury, except as provided by the rules of the arbitration forum in which a claim is filed.**

B. **Arbitration awards are generally final and binding; a party's ability to have a court reverse or modify an arbitration award is very limited.**

C. **The ability of the parties to obtain documents, witness statements and other discovery is generally more limited in arbitration than in court proceedings.**

D. **The arbitrators do not have to explain the reason(s) for their award unless, in an eligible case, a joint request for an explained decision has been submitted by all parties to the panel at least 20 days prior to the first scheduled hearing date.**

E. **The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.**

F. **The rules of some arbitration forums may impose time limits for bringing a claim in arbitration. In some cases, a claim that is ineligible for arbitration may be brought in court.**

**Berthel Fisher & Company Financial Services, Inc. Client Agreement**

- The rules of the arbitration forum in which the claim is filed, and any amendments thereto, shall be incorporated into this agreement.
- This Agreement to arbitrate constitutes a waiver of the right to seek a judicial forum unless such a waiver would be void under the Federal securities laws.

Any controversy arising out of or relating to your Accounts, to your transactions with BFCFS, to BFCFS's officers, directors, agents, employees, to the clearing agent, to this Agreement, or the breach thereof, whether such transaction or agreement was entered into prior, on, or subsequent to the date hereof, shall be settled by arbitration in accordance with the rules then in effect of the FINRA. I understand that the FINRA eligibility requirement may bar claims brought more than six (6) years after the event giving rise to the claim. Judgment upon any award rendered by the arbitrators may be entered in any court having jurisdiction thereof.

No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class action who has not opted out of the class with respect to any claims encompassed by the putative class action until: (i) the class certification is denied; or (ii) the class is decertified; or (iii) the customer is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this agreement except to the extent stated herein.

22. You confirm that you understand the following features of your Account and that your Registered Representative has disclosed these features to you.

A. Securities offered through BFCFS, member FINRA/SIPC, are not insured by the FDIC, the NCUSIF, or any government agency. They are not deposits or obligations of, nor guaranteed by, any financial institution, and are subject to investment risks, including possible loss of the principal amount invested.

B. Investment returns are not guaranteed, and past performance does not guarantee future results.

C. Your Registered Representative does not provide tax advice. You are responsible for consulting your tax advisor regarding the tax consequences of investing in securities products.

D. You acknowledge your responsibility to read the prospectus of any mutual fund/ money market fund/ FDIC Insured Bank Deposit Sweep Program/variable annuity/direct participation program/private placement memorandum and/or new issue offerings which contain information regarding investment objectives, risks, and other material facts, including sales charges. I understand that it is my responsibility to read the prospectus or disclosure document, as applicable, for any mutual fund or FDIC- Insured Bank Deposit Sweep Program into which I purchase or exchange. I have received and read the applicable prospectus or disclosure document for the mutual fund or FDIC-Insured Bank Deposit Sweep Program that I chose for my Core Account Investment Vehicle- and I agree to the terms and conditions of the prospectus or disclosure document, as applicable. If I do not choose a Core Account Investment vehicle for my account I authorize my Broker/Dealer to, in its sole discretion, to use their Default Core Account Fidelity Money Market fund or FDIC-Insured Bank Deposit Sweep Program as my Core Account Investment Vehicle and I shall hold my Broker/Dealer and NFS harmless for such default selection and any consequences resulting therefrom. I understand that different Core Account Investment Vehicles may have different rates of return and terms and conditions, such as FDIC insurance or SIPC protection, and that my Broker/Dealer may not consider these differences when making a default Core Account Investment Vehicle selection for me. If I choose a FDIC-Insured Bank Deposit Sweep Program for my Core Account Investment Vehicle, I represent that I am: (1)a natural person or (2)if I am a fiduciary, including trustee, custodian, agent, administrator or executor, each of the beneficial owners of the account is a natural person or (3) if this account is being established as an IRA-BDA or Roth IRA-BDA, any such beneficiary is a natural person. FDIC Insured Bank Deposit Sweep program QPRMQ will be the default for those accounts meeting the above criteria. All other accounts will have the default of FZBXX – Fidelity Government: Daily Money Class

E. You agree a photocopy, electronically scanned image or facsimile of the Client Account Form and this Agreement and signatures thereon shall be deemed an original for purposes of introducing the Client Account Form and this Agreement into evidence as part of any proceeding.

F. BFCFS does not accept cash, cashiers checks under $10,000 (unless bank provides documentation of source of funds), money orders, third-party checks or temporary checks for payment. When remitting payment, you will make your check payable to the Clearing Firm or to the investment/insurance company, whichever is applicable.

23. In accordance with Securities and Exchange Commission ("SEC") regulations, BFCFS is providing the following investment objective and risk tolerance definitions. These definitions are provided for informational purposes and do not imply that any investment will achieve its objective.

**Objectives**

A. **Preservation of Capital:** Seeks to maintain regular and consistent returns on investment in the form of interest and dividend payments, while assigning priority to preserving principal for some short term use.

B. **Capital Appreciation (Growth):** Seeks capital appreciation through market price increase in investments. Dividend and interest returns may be important, but are not primary considerations.

C. **Income:** Seeks regular and consistent returns on investment in the form of interest and dividend payments. Little consideration is given to capital appreciation.

D. **Growth & Income:** Seeks a combination of both capital appreciation and return in the form of interest and dividend payments.

E. **Speculation:** Seeks to maximize total return through a broad range of investment strategies which involve a high level of risk

**Risk Tolerance Levels**

A. **Conservative:** Generally reflects an investor who has a low tolerance for risk. Preservation of capital is often a major consideration. Such an investor is willing to limit or forego capital appreciation opportunities or higher income returns in order to protect his/her investment capital.

B. **Moderately Conservative:** Generally reflects an investor who has a moderate to low tolerance for risk. Preservation of capital is balanced with a somewhat modest amount of risk in order to achieve preservation of capital and a modest amount of capital appreciation.

C. **Moderate:** Generally reflects an investor who has the financial resources and investment experience to accept a modest amount of risk in order to achieve capital appreciation or higher income returns. Such an investor can accept some loss of capital in seeking to meet his/her investment goal.

D. **Moderately Aggressive:** Generally reflects an investor who has a moderate to high tolerance for risk. Such an investor can accept a moderate amount of capital loss in order to achieve his/her investment goals.

E. **Aggressive:** Generally reflects an investor who seeks the most capital appreciation or a higher income return and who is financially able and willing to risk losing a substantial portion of investment capital to achieve his/her objectives. The aggressive investor will seek to maximize his/her total return through a broad range of investments and strategies that may include purchasing low-priced, low rated or volatile securities, using a high degree of leverage or engaging in a high level of activity. Knowledge of investment strategies and investment experience are important considerations.

Please review this Agreement and Client Account Form carefully. If there are any errors or omissions on either, you must notify BFCFS or your Registered Representative in writing within 30 days of your receipt of these documents. If you do not notify us, then the information on these documents will be deemed correct. Inquiries or complaints may be sent to:

**Berthel Fisher & Company Financial Services, Inc.**
**Attn: Compliance,**
**4201 42nd St. NE, Suite 100**
**P.O. Box 11340,**
**Cedar Rapids, Iowa, 52410-1340**
**Phone (319) 447-5700**

# Terms

## Financial Information

**Liquid Assets**

Assets that can be easily liquidated and accessed within 7 days or less regardless of whether a penalty is incurred. Examples include savings accounts, mutual funds, IRAs, 401(k) s.  It does not include real estate investments, limited partnerships, restricted stocks or other assets that cannot be easily liquidated.

**Net Worth**

Assets minus liabilities excluding your residence

## Investment Objectives

**Preservation of Capital**

Primarily seeks to preserve capital and avoid loss of investment.  Secondarily seeks a minimum return through high quality fixed income investments.

**Capital Appreciation (Growth)**

Seeks capital appreciation through market price increases in investments. Dividend and interest returns may be important, but are not primary considerations.

**Income**

Seeks regular and consistent returns on investment in the form of interest and dividend payments.  Little consideration is given to capital appreciation.

**Growth and Income**

Seeks to combine both capital appreciation and income by investing in various types of securities and using various types of investment strategies.  The structure of a growth and income portfolio is based on an investor's individual needs and risk tolerances as well as consideration of market conditions and trends.

**Speculation**

Seeks to maximize total return through a broad range of investment strategies which involve a high level of risk.

## Risk Tolerance

**Conservative**

Generally reflects an investor who has a low tolerance for risk.  Preservation of capital is often a major consideration.  Such an investor is willing to limit or forgo capital appreciation opportunities or higher income returns in order to protect his or her investment capital.

**Moderately Conservative**

Generally reflects an investor who has a moderate to low tolerance for risk. Preservation of capital is balanced with a somewhat modest amount of risk in order to achieve preservation of capital and a modest amount of capital appreciation.

**Moderate**

Generally reflects an investor who has the financial resources and investment experience to accept a modest amount of risk in order to achieve capital appreciation or higher income returns.  Such an investor can accept some loss of capital in seeking to meet his or her investment goal.

**Moderately Aggressive**

Generally reflects an investor who has a moderate to high tolerance for risk.  Such an investor can accept a moderate amount of capital loss in order to achieve his/her investment goals.

**Aggressive**

Generally reflects an investor who seeks the most capital appreciation or a higher income return and who is financially able and willing to risk losing a substantial portion of investment capital to achieve his or her objectives.  The aggressive investor will seek to maximize his or her total return through a broad range of investments and strategies that may include purchasing low-priced, low rated, or volatile securities, using a high degree of leverage, or engaging in a high level of activity.  Knowledge of investment strategies and investment experience are important considerations.

**Other Terms**

| | |
|---|---|
| Liquidity Needs | The ability to quickly and easily convert to cash all or a portion of the investments in this account without experiencing significant loss in value from, for example, the lack of a ready market or incurring significant costs or penalties. |
| Discretion | Permission given to the representative by the client to buy and sell without the client's prior knowledge |
| Investment Experience | Indicates the number of years the client has invested in Bonds, Limited Partnerships, Annuities, Mutual Funds, Options, and Stocks.  If a category is mark "N/A", it means the client does not have investment experience in that category. |

**Client Identification Notice**

To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. What this means for you, is that when you open an account we will ask you for your name, address, date of birth, and other information that will allow us to identify you.  We may use third party sources to verify the information provided and may also ask to see your driver's license or other identifying documents.

**Other Important Information**

- If anything changes in your financial situation or investment objectives or you would like to make changes to the management of your account please contact your registered representative.
- Please contact your registered representative immediately if you find any discrepancies on your account statement(s).  Any statement discrepancies reported after 30 days from the date of the statement will be handled on a "best efforts" basis.

**If you have any concerns or complaints regarding your account,
please contact Berthel Fisher & Company Financial Services, Inc. Compliance Department
at 1-800-356-5234, or write to:**

**Berthel Fisher & Company Financial Services, Inc.
Attn:  Compliance
P.O. Box 11340
Cedar Rapids, Iowa, 52410-1340**



# CONSUMER PRIVACY

## PRIVACY NOTICE AND POLICY

You are receiving this privacy notice from Berthel Fisher & Company and its subsidiaries and affiliates, including but not limited to Berthel Fisher & Company Financial Services, Inc. (member FINRA/SIPC), Securities Management and Research, Inc. (member FINRA/SIPC), BFC Planning, Inc. and Commercial Power Finance, Inc. (collectively referred to as "Berthel Fisher") and on behalf of the Registered Representatives and Investment Adviser Representatives who are associated with Berthel Fisher ("Representatives") because you are either a customer or investor of Berthel Fisher or are considering becoming one.  This notice describes our practice concerning the handling of your personal information.

## SECURITY STANDARDS

Berthel Fisher is committed to protecting the personal data we obtain from you to help protect against disclosure of information to unauthorized parties.  Only those persons who need to do so as part of their job responsibilities are authorized to have access to your information.   We train our employees on privacy and information security and on their obligations to protect your information.

## INFORMATION WE GATHER AND SHARE WITH OTHER COMPANIES

We do collect and retain nonpublic personal information about you, including information we receive from you or your Representative, such as your name and address, tax identification number, account balances, financial information, servicing information and brokerage activity.

While we do not sell information to third parties, we may disclose nonpublic personal information about you to affiliates, Representatives, regulators, or to third party firms we may retain for clearing, accounting, legal, computer and software services and as permitted by law.  We are selective in choosing these companies and we restrict the information we provide them to only what they need to do their job. They are not permitted to use the information for any purpose other than to assist in the servicing of your accounts or as permitted by law and they are not permitted to release this information, use it for their own purposes or transfer it to any other party.  If you close your Berthel Fisher account or if your Representative elects to change firms, your Representative will be permitted to retain copies of your non-public information to assist with the timely transfer of your account and to continue to serve you at the new firm.  If you do not want your Representative to transfer this information, please notify us in writing at the address below to opt out of this information sharing.

## MAINTAINING ACCURATE INFORMATION

We strive to maintain complete and accurate information about you and your accounts.  If you believe that our records contain inaccurate or incomplete information about you, or you believe we have reported information about you, which we should not have done, please contact us immediately.  We will investigate your concern and correct any inaccuracies we find and will confirm with you, any actions we take.

Berthel Fisher & Company
4201 42nd St. NE, Suite 100
P.O. Box 11340
Cedar Rapids, Iowa, 52410-1340
1-800-356-5234



**Financial Services, Inc.**
Member FINRA/SIPC

## BERTHEL FISHER & COMPANY FINANCIAL SERVICES, INC.
## BUSINESS CONTINUITY DISCLOSURE PLAN

Berthel Fisher & Company Financial Services, Inc. ("Berthel Fisher") has developed a Business Continuity Plan on how we will respond to events that significantly disrupt our business. Since the timing and impact of disasters and disruptions is unpredictable, we will have to be flexible in responding to actual events as they occur. With that in mind, we are providing you with this information on our business continuity plan.

**Contacting Us**
Your primary contact should always be your registered representative. However, if you need to contact us during or after a significant business disruption, you should first call (888) 202-2326. If you cannot reach us at that number, you should call our alternative number at (800) 356-5234 or go to our website at www.berthel.com. Additionally, if your account is held directly with a mutual fund, insurance company, or product sponsor, you may access your account information directly by using the contact information on your statement. If you have a brokerage account through National Financial Services, LLC, our clearing firm, you can contact them at (800) 801-9942 for instructions on how to access your account(s).

**Our Business Continuity Plan**
We plan to quickly recover and resume business operations after a significant business disruption and respond by safeguarding our employees and property, making a financial and operational assessment, protecting the firm's books and records, and allowing our customers to transact business. In short, our business continuity plan is designed to permit our firm to resume operations as quickly as possible, given the scope and severity of the significant business disruption.

Our business continuity plan addresses: data backup and recovery; all mission critical systems; financial and operational assessments; alternative communications with customers, employees, and regulators; alternate physical location of employees; critical supplier, contractor, bank and counter-party impact; regulatory reporting; and assuring our customers prompt access to their funds and securities if we are unable to continue our business.

Our clearing firm, National Financial Services, LLC, backs up our important records in a geographically separate area. While every emergency situation poses unique problems based on external factors, such as time of day and the severity of the disruption, we have been advised by our clearing firm that its objective is to restore its own operations and be able to complete existing transactions and accept new transactions and payments within approximately four hours. Your orders and requests for funds and securities could be delayed during this period.

Berthel Fisher registered representatives may or may not be affected by any business disruption that affects the home office depending on their location. Similarly, depending upon the product vendor and its location, it may or may not be affected by a business disruption that affects the home office. Conversely, a disruption may affect your registered representative or a particular vendor but not the home office. The contact information provided above should help you determine alternate mean of communication regardless of the disruption or area of business affected.

**Varying Disruptions**
Significant business disruptions can vary in their scope, such as only our home office, a single building housing our home office, the business district where our home office is located, the city where we are located, or the whole region. Within each of these areas, the severity of the disruption can also vary from minimal to severe. In a disruption to only our home office or a building housing our home office, we will transfer our operations to a local site when needed and expect to recover and resume business within a reasonable period of time. In a disruption affecting our business district, city, or region, we will transfer our operations to a site outside of the affected area, and recover and resume business within a reasonable period of time. In either situation, we plan to continue in business, transfer operations to our clearing firm if necessary, and notify you through our website www.berthel.com or phone number, (888) 202-2326 on how to contact us. If the significant business disruption is so severe that it prevents us from remaining in business, we will assure our customers' prompt access to their funds and securities.

**For more information**
If you have questions about our business continuity planning, you can contact us in writing at Berthel Fisher, Attention: Compliance, 4201 42nd St. NE, Suite 100, P.O. Box 11340, Cedar Rapids, Iowa, 52410-1340 or via phone at (800) 356-5234.



BERTHEL FISHER
& COMPANY
*Financial Services, Inc.*
Member FINRA/SIPC

# Mutual Funds Breakpoint Discounts Disclosure Statement

Before investing in mutual funds, it is important that you understand the sales charges, expenses, and management fees that you will be charged, as well as the breakpoint discounts to which you may be entitled. Understanding these charges and breakpoint discounts will assist you in identifying the best investment for your particular needs and may help you reduce the costs of your investment. This disclosure document will give you general background information about these charges and discounts. However, sales charges, expenses, management fees, and breakpoint discounts vary from mutual fund to mutual fund. Therefore, you should discuss these issues with your financial advisor and review each mutual fund's prospectus and statement of additional information, which are available from your financial advisor, to get the specific information regarding the charges and breakpoint discounts associated with a particular mutual fund.

### Sales Charges

Investors that purchase mutual funds must make certain choices, including which funds to purchase and which class share is most advantageous. Each mutual fund has a specified investment strategy. You need to consider whether the mutual fund's investment strategy is compatible with your investment objectives. Additionally, most mutual funds offer different share classes. Although each share class represents a similar interest in the mutual fund's portfolio, the mutual fund will charge you different fees and expenses depending upon your choice of share class. As a general rule, Class A shares carry a "front-end" sales charge or "load" that is deducted from your investment at the time you buy fund shares. This sales charge is a percentage of your total purchase. As explained below, many mutual funds offer volume discounts to the front-end sales charge assessed on Class A shares at certain predetermined levels of investment, which are called "breakpoint discounts." In contrast, Class B and C shares usually do not carry any front-end sales charges. Instead, investors that purchase Class B or C shares pay asset based sales charges, which may be higher than the charges associated with Class A shares. Investors that purchase Class B and C shares may also be required to pay a sales charge known as a contingent deferred sales charge when they sell their shares, depending upon the rules of the particular mutual fund.

### Breakpoint Discounts

Most mutual funds offer investors a variety of ways to qualify for breakpoint discounts on the sales charge associated with the purchase of Class A shares. In general, most mutual funds provide breakpoint discounts to investors who make large purchases at one time. The extent of the discount depends upon the size of the purchase. Generally, as the amount of the purchase increases, the percentage used to determine the sales load decreases. In fact, the entire sales charge may be waived for investors that make very large purchases of Class A shares. Mutual fund prospectuses contain tables that illustrate the available breakpoint discounts and the investment levels at which breakpoint discounts apply. Additionally, most mutual funds allow investors to qualify for breakpoint discounts based upon current holdings from prior purchases through "*Rights of Accumulation*," and future purchases, based upon "*Letters of Intent.*" This document provides general information regarding *Rights of Accumulation* and *Letters of Intent*. However, mutual funds have different rules regarding the availability of *Rights of Accumulation* and *Letters of Intent*. Therefore, you should discuss these issues with your financial advisor and review the mutual fund prospectus to determine the specific terms upon which a mutual fund offers *Rights of Accumulation* or *Letters of Intent*.

1.  **Rights of Accumulation** – Many mutual funds allow investors to count the value of previous purchases of the same fund, or another fund within the same fund family, with the value of the current purchase, to qualify for breakpoint discounts. Moreover, mutual funds allow investors to count existing holdings in multiple accounts, such as IRAs or accounts at other broker-dealers, to qualify for breakpoint discounts. Therefore, if you have accounts at other broker-dealers and wish to take advantage of the balances in these accounts to qualify for a breakpoint discount, you must advise your financial advisor about those balances. You may need to provide documentation establishing the holdings in those other accounts to your financial advisor if you wish to rely upon balances in accounts at another firm.

In addition, many mutual funds allow investors to count the value of holdings in accounts of certain related parties, such as spouses or children, to qualify for breakpoint discounts. Each mutual fund has different rules that govern when relatives may rely upon each other's holdings to qualify for breakpoint discounts. You should consult with your financial advisor or review the mutual fund's prospectus or statement of additional information to determine what these rules are for the fund family in which you are investing. If you wish to rely upon the holdings of related parties to qualify for a breakpoint discount, you should advise your financial advisor about these accounts. You may need to provide documentation to your financial advisor if you wish to rely upon balances in accounts at another firm.

Mutual funds also follow different rules to determine the value of existing holdings. Some funds use the current net asset value (NAV) of existing investments in determining whether an investor qualifies for a breakpoint discount. However, a small number of funds use the historical cost, which is the cost of the initial purchase, to determine eligibility for breakpoint discounts. If the mutual fund uses historical costs, you may need to provide account records, such as confirmation statements or monthly statements, to qualify for a breakpoint discount based upon previous purchases. You should consult with your financial advisor and review the mutual fund's prospectus to determine whether the mutual fund uses either NAV or historical costs to determine breakpoint eligibility.

2. *Letters of Intent* – Most mutual funds allow investors to qualify for breakpoint discounts by signing a Letter of Intent, which commits the investor to purchasing a specified amount of Class A shares within a defined period of time, usually 13 months. For example, if an investor plans to purchase $50,000 worth of Class A shares over a period of 13 months, but each individual purchase would not qualify for a breakpoint discount, the investor could sign a Letter of Intent at the time of the first purchase and receive the breakpoint discount associated with $50,000 investments on the first and all subsequent purchases.  Additionally, some funds offer retroactive Letters of Intent that allow investors to rely upon purchases in the recent past to qualify for a breakpoint discount. However, if an investor fails to invest the amount required by the Letter of Intent, the fund is entitled to retroactively deduct the correct sales charges based upon the amount that the investor actually invested. If you intend to make several purchases within a 13 month period, you should consult your financial advisor and the mutual fund prospectus to determine if it would be beneficial for you to sign a Letter of Intent.

As you can see, understanding the availability of breakpoint discounts is important because it may allow you to purchase Class A shares at a lower price. The availability of breakpoint discounts may save you money and may also affect your decision regarding the appropriate share class in which to invest. Therefore, you should discuss the availability of breakpoint discounts with your financial advisor and carefully review the mutual fund prospectus and its statement of additional information, which you can get from your financial advisor, when choosing among the share classes offered by a mutual fund. If you wish to learn more about mutual fund share classes or mutual fund breakpoints, you may wish to review the investor alerts available on the FINRA Web site. See *Understanding Mutual Fund Classes* at http://www.finra.org/InvestorInformation/InvestorAlerts/MutualFunds/UnderstandingMutualFundClasses/index.ht m, and *Mutual Fund Breakpoints: A Break Worth Taking* at http://www.finra.org/InvestorInformation/InvestorAlerts/MutualFunds/MutualFundBreakpointsABreakWorthTakin g/index.htm visit the many mutual fund Web sites available to the public.

November 2007